**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

BOYLE, *et al.*,

                    Plaintiffs,

      v.

TRUMP, *et al.*,

                    Defendants.

                    Case No. 8:25-cv-1628-MJM

<u>**OPPOSITION TO PLAINTIFFS' MOTION**</u>
<u>**FOR TEMPORARY RESTRAINING ORDER**</u>

**INTRODUCTION**

Almost two weeks after plaintiffs were removed from their positions as Commissioners on the Consumer Product Safety Commission ("CPSC," "Commission," or "Agency"), they filed a motion for temporary restraining order and preliminary injunction, asking this Court to "enter a TRO without delay" that would effectively reinstate plaintiffs as Commissioners while the parties brief the preliminary injunction motion. ECF No. 6 at 2. But such an order would contravene Supreme Court guidance issued just days ago, which cautioned against the "disruptive effect" of "repeated removal and reinstatement of officers during the pendency" of litigation. *Trump v. Wilcox*, No. 24A966, 2025 WL 1464804, at *1 (U.S. May 22, 2025). Indeed, the Supreme Court explained that "the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty. *Id*.

"Because the Constitution vests the executive power in the President, *see* Art. II, §1, cl. 1, he may remove without cause executive officers who exercise that power on his behalf." *Wilcox*, 2025 WL 1464804, at *1 (citing *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 215–18 (2020)). Although the Supreme Court has recognized two "narrow exceptions" to this general rule, *id.*, the CPSC falls within neither. Its Commissioners are principal officers removable at will because it is an Executive Branch agency that exercises substantial executive power. *See id.* (explaining that the "Government is likely to show that both the [removed officers] exercise considerable executive power"). Accordingly, the Court should hold that plaintiffs' terminations were lawful because the Commissioners' statutory removal protections are unconstitutional. Additionally, the Court should decline to reinstate plaintiffs because reinstatement is beyond the authority of any Article III court to grant. In all events, the Court should avoid making a rushed

decision on the merits at this extremely preliminary juncture and deny plaintiffs the extraordinary relief they seek because plaintiffs cannot meet their burden to show they will suffer irreparable harm absent a temporary restraining order or that the equities tip in their favor.  The Court should deny plaintiffs' emergency request for a temporary restraining order pending the preliminary injunction briefing.

## BACKGROUND

### I.    The CPSC and Its Statutory Framework

In 1972, Congress established the CPSC as an "independent regulatory commission" to (1) "protect the public against unreasonable risks of injury associated with consumer products"; (2) "assist consumers in evaluating the comparative safety of consumer products"; (3) "develop uniform safety standards for consumer products and to minimize conflicting State and local regulations"; and (4) "promote research and investigation into the causes and prevention of product-related deaths, illnesses, and injuries."  15 U.S.C. §§ 2051(b), 2053(a).  The Commission consists of "five Commissioners who shall be appointed by the President, by and with the advice and consent of the Senate."  *Id.* § 2053(a).  Each Commissioner serves a seven-year term, and no more than three of the five Commissioners "shall be affiliated with the same political party."  *Id.* § 2053(b)(1).  Notably, each Commissioner enjoys removal protection: "Any member of the Commission may be removed by the President for neglect of duty or malfeasance in office but for no other cause."  *Id.* § 2053(a).

Like the other Commissioners, the Commission's "Chairman shall be appointed by the President, by and with the advice and consent of the Senate, from among the members of the Commission," and "[a]n individual may be appointed as a member of the Commission and as Chairman at the same time."  *Id.* § 2053(a).  Under the statute, the Chairman "shall be the principal

executive officer of the Commission" and "shall exercise all of the executive and administrative functions of the Commission," including the power to appoint "as officers of the Commission an Executive Director, a General Counsel," and others, subject to the approval of the Commission. *Id.* § 2053(f)(1), (g)(1)(A).

The Commission wields extensive executive power. By statute, the Commission has broad rulemaking authority to "promulgate consumer product safety standards" that are "reasonably necessary to prevent or reduce an unreasonable risk of injury" associated with the consumer products. *Id.* § 2056(a). This includes the authority to completely "ban[]" certain consumer products as "hazardous" if the Commission finds that the consumer product "presents an unreasonable risk of injury" and that "no feasible consumer product safety standard . . . would adequately protect the public from the unreasonable risk of injury associated with such product." *Id.* § 2057. The Commission also has the authority to inspect "any factory, warehouse, or establishment in which consumer products are manufactured or held" for compliance with the Commission's rules. *Id.* § 2065(a). And the Commission has the authority to require manufacturers, private labelers, and distributors to maintain (and produce on demand) records "relevant to determining whether such manufacturer, private labeler, or distributor has acted or is acting in compliance with" the statute. *Id.* § 2065(b).

Under the statute, it is "unlawful for any person" to, among other things, manufacture or sell a consumer product that does not conform to "an applicable consumer product safety rule" or fail or refuse to make a premises and records available for inspection. *Id.* § 2068(a)(1), (3), (4). To punish violations, the Commission may seek civil penalties of up to $100,000 per violation, subject to a cap of $15 million "for any related series of violations." *Id.* §§ 2069(a)(1), (b), 2076(b)(7)(A). The Commission can likewise bring criminal prosecutions that can result in up to

five years' imprisonment. *Id.* §§ 2070(a), 2076(b)(7)(B). The Commission can pursue injunctive relief to "[r]estrain any violation" of its rules, *id.* § 2071(a), and also has the power to issue and enforce subpoenas through litigation, *id.* § 2076(b)(3), (c).

The Commission exercises significant power to conduct administrative adjudications. The statute allows the Commission to "conduct any hearing or other inquiry necessary or appropriate to its functions anywhere in the United States." *Id.* § 2076(a); *see also id.* § 2064(c), (d), (f). With that authority, the Commission has promulgated extensive rules that govern adjudications, including "adjudicative proceedings for the assessment of civil penalties" where the Commission does not first pursue civil penalties in federal court. 16 C.F.R. § 1025.1

In addition, the Commission is also authorized to sue in federal district court (1) against an "imminently hazardous consumer product for seizure of such product," (2) against the manufacturer, distributor, or retailer of such product, or (3) against both. *Id.* § 2061(a). Under this section of the statute, an "imminently hazardous consumer product" is "a consumer product which presents imminent and unreasonable risk of death, serious illness, or severe personal injury" for these purposes. *Id.* The Commission may file such a lawsuit whether or not there is a consumer product safety rule applicable to such product. *Id.*

## II.    This Case

Plaintiffs Mary Boyle, Alexander Hoehn-Saric, and Richard Trumka, Jr. were nominated by former President Biden and confirmed by the Senate to serve as CPSC Commissioners for terms ending in October 2025, October 2027, and October 2028, respectively. ECF Dkt. 1 ¶ 2. On May 8, 2025, Plaintiffs Boyle and Trumka received emails on behalf of President Trump informing them that their positions on the CPSC were terminated effectively immediately and thanking them for their service. *Id.* ¶ 21. On May 9, 2025, Plaintiff Hoehn-Saric was informed by Defendant

Peter A. Feldman, the Acting Chairman of the Commission, that the President had terminated Plaintiff Hoehn-Saric from his role as a CPSC Commissioner. *Id.* ¶ 22.

Almost two weeks later, Plaintiffs sued, arguing that their removals were ultra vires and "exceed the President's constitutional and statutory authority." *Id.* ¶ 29. Plaintiffs seek (1) a declaration that "Defendants' removal of [p]laintiffs from their roles as CPSC Commissioners was unlawful and that [p]laintiffs are entitled to continue serving out their terms as CPSC Commissioners"; (2) an order enjoining Defendant Feldman from "obstructing [p]laintiffs in any way from carrying out their duties as CPSC Commissioners, including by terminating their staff and barring their access to agency resources"; and (3) an order enjoining "Defendants Bessent, Vought, and Feldman from depriving [p]laintiffs of the pay and benefits that [p]laintiffs are entitled to receive as CPSC Commissioners" and "to restore all pay and benefits that have been unlawfully withheld from [p]laintiffs and their staff." *Id.* ¶ 31(a), (b), (c). Plaintiffs moved for a temporary restraining order and preliminary injunction, arguing that they would be irreparably harmed absent intervention from the court. *See* ECF No. 6.

## LEGAL STANDARD

"The standard for a temporary restraining order is the same as a preliminary injunction." *Maages Auditorium v. Prince George's Cnty., Md.*, 4 F. Supp. 3d 752, 760 (D. Md. 2014), *aff'd sub nom. Maages Auditorium v. Prince George's Cnty., Maryland*, 681 F. App'x 256 (4th Cir. 2017). To warrant preliminary relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth

factors of the analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

**I.  Plaintiffs are not likely to succeed on the merits because restrictions on the removal of CPSC Commissioners are inconsistent with the President's constitutional authority and therefore unlawful.**

Plaintiffs contend that the President did not validly remove them from office because CPSC Commissioners may be removed only for "neglect of duty or malfeasance" and those kinds of tenure protections are constitutional for multimember bodies under *Humphrey's Executor*.  ECF No. 6 at 7, 9.  But CPSC Commissioners are principal officers who lead a freestanding component within the Executive Branch and exercise significant executive power.  Accordingly, because the entirety of the executive power is vested in the President, *see* U.S. Const. Art. II, § 1, cl. 1, the President must be able to remove CPSC Commissioners at will, and the Court should deny plaintiffs' motion for temporary restraining order.

### a.  Aside from two narrow exceptions, Article II requires executive officers to be removable at will by the president.

The Constitution vests all of the "executive Power" in the President, who is given the sole responsibility to "take Care that the Laws be faithfully executed."  U.S. Const. Art. II, § 1, cl. 1; *id.* § 3.  "[A]s a general matter," the executive power encompasses "the authority to remove those who assist [the President] in carrying out his duties."  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 513–14 (2010).  Without such power, the President would be unable to control those who aid him in executing the laws and "could not be held fully accountable for discharging his own responsibilities."  *Id.* at 514.  For nearly a century, the Supreme Court has repeatedly reaffirmed "the general rule that the President possesses 'the authority to remove those who assist

him in carrying out his duties.'" *Seila Law*, 591 U.S. at 215 (quoting *Free Enter. Fund.*, 561 U.S. at 514–15).

The Supreme Court has recognized "only two exceptions to the President's unrestricted removal power." *Id.* at 204. First, in *Humphrey's Executor*, 295 U.S. 602, the Supreme Court held that Congress could impose for-cause removal restrictions on "a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Seila Law*, 591 U.S. at 216. Second, in *Morrison v. Olson*, 487 U.S. 654 (1988), and *United States v. Perkins*, 116 U.S. 483 (1886), the Court recognized an exception "for inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 591 U.S. at 218. Those exceptions represent the "outermost constitutional limits of permissible congressional restrictions on the President's removal power" under current precedent. *Id.* (quoting *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 196 (D.C. Cir. 2018) (Kavanaugh, J., dissenting)).

The Supreme Court has reaffirmed this general rule and these "narrow exceptions," even as recently as a few days ago. *Wilcox*, 2025 WL 1464804, at *1. In *Wilcox*, the Supreme Court granted a stay pending appeal from district court orders that enjoined the President's removal of a member of the National Labor Relations Board ("NLRB") and a member of the Merit Systems Protection Board ("MSPB"). *Id.* The Supreme Court explained that the "stay reflects [its] judgment that the Government is likely to show that both the NLRB and MSPB exercise considerable executive power." *Id.*

      **b. The CPSC wields substantial expective power and does not follow into one of the two narrow removal exceptions.**

Commissioners of the CPSC do not fit within either of these exceptions. They are not inferior officers with narrowly defined duties; rather, they are principal officers appointed by the

President with Senate confirmation.  *See* U.S. Const. art. II, § 2, cl. 2; 15 U.S.C. § 41.  They oversee their own department.  *See Free Enter. Fund*, 561 U.S. at 511 (explaining that a department "is a freestanding component of the Executive Branch, not subordinate to or contained within any other such component[]").  And they are not subservient to any other principal officer.  *See* 15 U.S.C. § 41. The *Morrison* exception therefore does not apply, and plaintiffs do not appear to argue that it does.  *See* ECF No. 6 at 7–9.

Nor does the *Humphrey's Executor* exception apply.  In *Humphrey's Executor*, the Supreme Court upheld the constitutionality of a provision prohibiting removal of 1935 Federal Trade Commission ("FTC") Commissioners absent "inefficiency, neglect of duty, or malfeasance in office."  295 U.S. at 623.  Despite reaffirming the then-recent holding of *Myers v. United States*, 272 U.S. 52 (1926), that the President "has unrestrictable power . . . to remove purely executive officers," *id.* at 632, *Humphrey's Executor* concluded that *Myers* did not control because the FTC Commissioner at issue was "an officer who occupies no place in the executive department and who exercises no part of the executive power vested by the Constitution in the President," *id.* at 628.  Instead, *Humphrey's Executor* understood the 1935 FTC to be "an administrative body" that "carr[ied] into effect legislative policies" and "perform[ed] other specified duties as a legislative or as a judicial aid."  *Id.*  Those duties, according to the Court, "c[ould] not in any proper sense be characterized as an arm or an eye of the executive."  *Id.*  The Court thus understood the 1935 FTC not to be exercising executive power at all but rather to "act[] in part quasi legislatively and in part quasi judicially."  *Id.*  On that understanding, *Humphrey's Executor* found no constitutional problem with restricting the removal of FTC Commissioners in 1935.  But as the Supreme Court made clear in *Seila Law*, that exception is limited to "multimember bodies with 'quasi-judicial' or

'quasi-legislative' functions" that exercise no executive power. *Seila Law*, 591 U.S. at 216–17 (quoting *Humphrey's Executor*, 295 U.S. at 632).

In *Seila Law*, the Supreme Court held that the structure of the Consumer Financial Protection Bureau ("CFPB"), under which the Director could not be removed except for inefficiency, neglect, or malfeasance, was unconstitutional. *Seila Law*, 591 U.S. at 203–05. The Court explained that unlike "the 1935 FTC," the CFPB had three types of power that were indisputably executive. *Id.* at 218–19. First, the CFPB had "the authority to promulgate binding rules fleshing out 19 federal statutes, including a broad prohibition on unfair and deceptive practices in a major segment of the U. S. economy." *Id.* at 218. Second, the CFPB could "unilaterally issue final decisions awarding legal and equitable relief in administrative adjudications." *Id.* at 219. And third, the CFPB's "enforcement authority include[d] the power to seek monetary penalties against private parties on behalf of the United States in federal court—a quintessentially executive power not considered in *Humphrey's Executor*." *Id.* In addition, the Court noted that the CFPB was headed by a "single director." *Id.* The CFPB thus lacked both elements that are required for the *Humphrey's Executor* exception to apply: It "wield[ed] substantial executive power," and it was not a "multimember" agency. *Id.* at 218.

Although the CPSC is a multimember agency, it wields each of the three types of power that the Supreme Court found to be indisputably executive in *Seila Law*. First, the Commission wields broad rulemaking authority, including the power to "promulgate consumer product safety standards." 15 U.S.C. § 2056(a). Agency rulemakings "are exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power.'" *Seila Law*, 591 U.S. at 216 n.2 (quotation omitted); *see id* at 218. And agency rules embody policy choices that require political accountability through the Chief Executive.

Second, the Commission has standalone authority to conduct administrative adjudications, including those carrying serious civil penalties. 15 U.S.C. § 2076(a); 16 C.F.R. § 1025.1. Once again, *Seila Law* recognized that this type of agency adjudication "*must be*" a form of executive power. 591 U.S. at 216 n.2 (quotation omitted). Even though it takes a "'judicial' form[]," a binding "adjudication" conducted by an agency without an Article III judge can be justified only as part of the executive's authority to "administer" a statutory scheme. *City of Arlington v. FCC*, 569 U.S. 290, 307, 304 n.4 (2013).

Third, the Commission has the power to enforce federal law by bringing both civil and criminal actions in federal court. It can bring suits seeking both injunctive relief and penalties of up to $100,000 per violation, and it can initiate criminal prosecutions that can result in up to five years' imprisonment. *See* 15 U.S.C. §§ 2069, 2070(a), 2071(a), 2076(b)(7). This by itself is enough to render the *Humphrey's Executor* exception inapplicable because, as the Supreme Court has recognized, such enforcement authority is "a quintessentially executive power not considered in *Humphrey's Executor*." *Seila Law*, 591 U.S. at 219.

As all three of these different authorities make clear, the Commission wields substantial executive power from top to bottom. If there were any doubt, the Commission also wields executive power of the type recognized in *Collins v. Yellen*, including the authority to "issue subpoenas" in support of its enforcement efforts. 594 U.S. 220, 254 (2021) (holding the structure of the Federal Housing Finance Agency—an "independent agency" tasked with regulating companies and, if necessary, stepping in as their conservator or receiver—violates the separation of powers where the single director of the agency could be removed only "for cause"); *see* 15 U.S.C. § 2076(b)(3), (c) (granting the Commission authority to issue subpoenas and enforce them through litigation). Accordingly, the CPSC unquestionably wields substantial executive power

such that it comfortably fits into the general rule that the President may remove principal officers at will—rather *Humphrey's Executor*'s narrow exception.

Plaintiffs nonetheless argue that *Humphrey's Executor* remains good law and governs this dispute. Defendants do not dispute the first proposition: Until the Supreme Court overrules it, *Humphrey's Executor* remains binding as to an agency with the characteristics the Supreme Court identified as dispositive in that case.[1] But this is not that case, and *Humphrey's Executor* does not govern.

Moreover, this court should not follow the decisions of the Fifth or Tenth Circuits because they were wrongly decided and do not properly apply *Seila Law*. *See Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 346 (5th Cir.); *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 761 (10th Cir. 2024).

The Fifth Circuit erred by concluding that the *Humphrey's Executor* exception "still protects any traditional independent agency headed by a multimember board—and thus still protects the Commission." *Id.* at 352 (quotation omitted) (explaining that because both the 1935 FTC at issue in *Humphrey's Executor* and the CPSC are multimember boards, balanced along partisan lines, with removal restrictions, the CPSC's removal restrictions should be upheld like *Humphrey's Executor* were). Notably, the Fifth Circuit agreed that the Commission exercises substantial executive power. *Id.* at 353–54. Nonetheless, the Fifth Circuit still concluded that *Humprey's Executor* controlled because (1) the CPSC's structure is well-grounded in historical precedent and structured similarly to many other independent, multimember agencies; (2) the

---

[1] While the government acknowledges that *Humphrey's Executor* is binding on this Court as to the 1935 FTC until overturned by the Supreme Court, *see Mallory v. Norfolk Southern Railway Co.*, 600 U.S. 122, 136 (2023), it preserves the argument that *Humphrey's Executor* was wrongly decided, *see, e.g.*, *Seila Law*, 591 U.S. at 239–51 (Thomas and Gorsuch, JJ., concurring in part) (advocating for the Court to "reconsider Humphrey's Executor in toto").

CPSC is governed by five commissioners—unlike the CFPB, which was headed by a single director; and (3) the CPSC's staggered terms still means that the president can influence the CPSC's leadership and budgetary process. *Id.* at 354. But the Fifth Circuit failed to properly account for the substantial executive power that the CPSC wields under the *Seila Law* analysis. Indeed, it did not account for it at all.

We know the Fifth Circuit erred for at least two reasons. First, if its reasoning were correct and the presence of a multimember, staggered term structure was enough for *Humphrey's Executor* to control, then *Humphrey's Executor*'s "narrow exception" would swallow the rule by its own terms. By the Fifth Circuit's own reasoning, "dozens" of agencies are structured like the CPSC. *Id.* at 352. And if they all automatically receive *Humphrey's Executor*'s protection, then the narrow exception would be eviscerated and the Supreme Court's guidance to evaluate each agency on a case-by-case basis would be contravened. *See Seila Law*, 591 U.S. at 204. Second, the Supreme Court has told us that whether an agency exercises substantial executive power is an independently required inquiry under *Seila Law*—the agency's structure does not alone subject an agency to the *Humphrey's Executor* exception. *Id.* at 218. Indeed, just days ago, the Supreme Court stayed a district court's order reinstating board members on the theory that *Humphrey's Executor* controls, concluding that "the Government is likely to show that both the NLRB and MSPB"—both multimember boards with staggered terms balanced along partisan lines— "exercise considerable executive power." *Wilcox*, 2025 WL 1464804, at *1. *Seila Law* explains that the *Humphrey's Executor* exception applies for "multimember expert agencies *that do not wield substantial executive power*." *Seila Law*, 591 U.S. at 218 (emphasis added). In other words, both the multimember expert agency part and the substantial executive power part are required to meet *Humprey Executor's* narrow exception. This means that multimember expert agencies that

*do* wield substantial executive power would not fall into *Humphrey's Executor*'s exception. Plainly, whether or not an agency wields substantial executive power is an essential and indispensable part of the test. *Id.* And this comports with the consistent rationale that animates the long line of Supreme Court removal cases: the President's power to remove is imperative to allow him to be held fully accountable for discharging his own responsibilities; the buck must stop with him. *See Free Enter. Fund*, 561 U.S. at 514. Because the Commission exercises substantial executive power, *Humphrey's Executor* does not control.

Like the Fifth Circuit, the Tenth Circuit concluded that *Humphrey's Executor* controlled because the CPSC is "structured similarly" to the FTC in *Humphrey's Executor. Leachco, Inc.*, 103 F.4th at 761. But although the Tenth Circuit explained *Seila Law*'s holding and some of its reasoning, it did not grapple with whether the CPSC exercised "substantial executive power" such that *Humphrey's Executor* would not control and instead just adopted the Fifth Circuit's reasoning. *Id.* at 762–63 (declining to "generate a [circuit] split with the Fifth Circuit"). For the reasons explained above, the Tenth Circuit's reasoning suffers from the same flaws as the Fifth's. Contrary to the Fifth's and Tenth Circuit's opinions, the analysis does not stop after a court determines that an agency is a multimember body. The agency's structure is not dispositive; whether it wields substantial executive power is. *See, e.g.*, *Wilcox*, 2025 WL 1464804, at *1 (concluding the "Government is likely to show that both the NLRB and MSPB exercise considerable executive power"); *Seila Law*, 591 U.S. at 218.

## II.    Plaintiffs cannot establish irreparable harm.

Apart from their failure to show a likelihood of success on the merits, plaintiffs cannot show irreparable harm. *See Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (requiring a "clear showing" of likelihood of irreparable harm). Plaintiffs' showing on

this essential element fails because they have not shown harm of the magnitude necessary to justify extraordinary emergency relief. They appear to contend that their ongoing harm stems from the deprivation of the opportunity to serve as Commissioners. ECF No 6 at 10. But plaintiffs cite no injury of a kind that the Supreme Court has recognized as irreparable in this context. *See Sampson*, 415 U.S. at 92 & n.68 (holding that, except in "genuinely extraordinary situation," loss of income and reputation do not amount to irreparable harm). Rather, courts across the country have concluded that loss of employment does not constitute irreparable harm. *See, e.g.*, *Bauer v. Summey*, 568 F. Supp. 3d 573, 604 (D.S.C. 2021) ("[L]oss of employment is not considered to be an irreparable injury because it is fully compensable by monetary damages."); *Hetreed v. Allstate Ins. Co.*, 135 F.3d 1155, 1158 (7th Cir. 1998); *Davis v. Billington*, 76 F. Supp. 3d 59, 65–66 (D.D.C. 2014) (collecting cases); *Farris v. Rice*, 453 F. Supp. 2d 76, 79–80 (D.D.C. 2006) ("cases are legion holding that loss of employment does not constitute irreparable injury"). Indeed, courts have repeatedly rejected the notion that the deprivation of a unique, singular, or high-level position is any more of an irreparable injury. *See Hetreed*, 135 F.3d at 1158 (loss of position as senior manager leading audit department not irreparable injury); *Marxe v. Jackson*, 833 F.2d 1121, 1122 (3d Cir. 1987) (division manager); *Rubino v. City of Mount Vernon*, 707 F.2d 53 (2d Cir. 1983) (mayoral-appointed City Assessor); *Franks v. Nimmo*, 683 F.2d 1290, 1291 (10th Cir. 1982) (Associate Chief of Staff for Research and Development position at Department of Veterans Affairs Medical Center); *EEOC v. City of Janesville*, 630 F.2d 1254, 1256 (7th Cir. 1980) (Chief of Police); *Levesque v. Maine*, 587 F.2d 78, 79 (1st Cir. 1978) (Maine Commissioner of Manpower); *Nichols v. Agency for Int'l Dev.*, 18 F. Supp. 2d 1, 2, 4 (D.D.C. 1998) (Chief of Information Management Systems, Office of Inspector General); *Burns v. GAO Emps. Fed. Credit Union*, No. 88-cv-3424, 1988 WL 134925, at *1–2 (D.D.C. Dec. 2, 1988) (President of Credit

Union Board of Directors). Accordingly, when principal officers have been removed from their posts, they generally have challenged those removals in suits for back pay. *See Humphrey's Executor*, 295 U.S. at 612 (challenge sought "to recover a sum of money alleged to be due"); *Myers*, 272 U.S. at 106 (same); *Wiener*, 357 U.S. at 349–51 (same). Remedies at law thus exist and could make plaintiffs whole here, foreclosing any showing of irreparable harm.

Plaintiffs' argument that they suffer irreparable harm because their "participation at the agency is urgency needed today" and their absence may preclude them from participating in "consequential decisions that will shape the future of the agency" fares no better. ECF No 6 at 10. First, this is not the type of injury that the Supreme Court has recognized as irreparable in this context. *See Wilcox*, 2025 WL 1464804, at *1 ("The stay also reflects our judgment that the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty.") And second, plaintiffs' argument proves the merits point. The premise underlying plaintiffs' argument is that they do not want to miss out on the opportunity to oppose the President's agenda and decisions that may be made to advance the President's directives. But this is the impetus behind Article II's removal power: Article II vests the President with the power to supervise and remove those who wield executive power on his behalf to maintain control over the Executive Branch. The President's accountability to the people is only possible through the Executive Branch being fully accountable to the President. Potentially missing out on the opportunity to oppose the President's proposals does not—and cannot consistent with our constitutional structure—constitute irreparable harm.

### III.    The balance of equities and public interest favor defendants.

The balance of the equities and public interest weigh strongly against reinstating plaintiffs as Commissioners of the CPSC.  Because the Commission is an executive agency exercising executive power, an injunction effectively reinstating two of its principal officers would raise grave separation-of-powers concerns and work a great and irreparable harm to the Executive.  *See Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *12 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting) (describing how "direct[ing] the President to recognize and work with an agency head whom he has already removed" "impinges on the 'conclusive and preclusive' power through which the President controls the Executive Branch that he is responsible for supervising" and thus causes irreparable harm).  Indeed, the recent *Wilcox* stay order from the Supreme Court teaches that, in removal cases, the "Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty."  *Wilcox*, 2025 WL 1464804, at *1.

The balancing should tilt in the Defendants' favor for very good reason.  The President cannot be compelled to retain the services of principal officers whom the President no longer believes should be entrusted with the exercise of executive power.  Imposing such a remedy would prevent the President from implementing his electoral mandate through his subordinates and undermine the accountability of the Executive Branch enshrined in the Constitution.  The President "is elected by the entire Nation" and all executive officers "remain[] subject to the ongoing supervision and control of the elected President."  *Seila Law*, 591 U.S. at 224.  Adding additional exceptions to that constitutional rule—and then reinstating principal officers subject to those additional exceptions—"heightens the concern that" the Executive Branch "may slip from the Executive's control, and thus from that of the people."  *Free Enter. Fund*, 561 U.S. at 499.  That

result is an affront to the Constitution and to the American people, who elected President Trump to manage the Executive Branch of their government.

The public interest is better served by Commissioners who hold the President's confidence and, accordingly, will more effectively serve him in executing his duties as Chief Executive. Plaintiffs' motion for temporary restraining order—which explains that plaintiffs are opposed to the President's priorities and policies—proves this very point. *See* ECF No. 6 at 4-5. "[T]he Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'" *Sampson*, 415 U.S. at 83 (quoting *Cafeteria & Rest. Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 896 (1961)). "Allowing another branch of government to insulate executive officers from presidential control . . . would sever a key constitutional link between the People and their government," contrary to the public interest. *Dellinger*, 2025 WL 559669 at *17 (Katsas, J., dissenting). Thus, plaintiffs' claimed equities cannot outweigh the grave and unprecedented harm an injunction would cause to the separation of powers and the President's authority to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

Plaintiffs urge this Court to consider "[p]ublic perception that the CPSC is a partisan body whose members act according to political pressure rather than their own expert judgment could undermine confidence in the essential guidance that the agency provides on consumer safety." ECF No. 6 at 12. But plaintiffs' urging resists the Constitution's very design and Article II's role in it.

IV.    **Even if the CPSC's removal protections are constitutional, plaintiffs are not entitled to reinstatement via injunctive relief or a declaratory judgment that would result in reinstatement.**

As explained above, President Trump lawfully exercised his Article II authority to remove his subordinates when he removed plaintiffs. But even if plaintiffs prevail on the merits, this Court

should deny the broad relief that plaintiffs seek, including reinstatement by injunction or declaratory relief that would result in reinstatement.

> **a. Plaintiffs are not entitled to an injunction that would effectively reinstate them to their positions.**

This Court lacks the power to issue any order reinstating principal executive officers removed by the President. Traditionally, executive officers challenging their removal by the President have sought back pay, not reinstatement. *See Wiener v. United States*, 357 U.S. 349, 350 (1958) (suit "for recovery of his salary"); *Humphrey's Executor*, 295 U.S. at 612 (suit "to recover a sum of money alleged to be due . . . for salary"); *Myers*, 272 U.S. at 106 (suit "for his salary from the date of his removal"); *Shurtleff v. United States*, 189 U.S. 311, 318 (1903) (suit "for salary"); *Parsons v. United States*, 167 U.S. 324, 326 (1897) (suit "for salary and fees"). That rule reflects the obvious separation of powers problems that arise if a court attempts to reinstate—that is, reappoint—a principal executive officer removed by the President. The President cannot be compelled to retain the services of a principal officer whom he no longer believes should be entrusted with the exercise of executive power. *Harris v. Bessent*, No. 25-5037, 2025 WL 1021435, at *4 (D.C. Cir. Apr. 7, 2025) (Rao, J., dissenting) ("The government is likely to succeed on its remedial challenge because the injunctive relief concocted by the district court is wholly unprecedented and transgresses historical limits on our equitable authority."). And the courts may not exercise the appointment power for principal officers, which the Constitution vests in the President alone.

Indeed, many members of the First Congress argued against requiring the Senate's advice and consent for removals precisely because of the risk that such a procedure would require the President to retain someone he had sought to remove. As Representative Benson observed: "If the Senate, upon its meeting, were to acquit the officer, and replace him in his station, the President

would then have a man forced on him whom he considered as unfaithful." *Myers*, 272 U.S. at 124 (citation omitted). Representative Boudinot argued: "But suppose [the Senate] shall decide in favor of the officer, what a situation is the President then in, surrounded by officers with whom, by his situation, he is compelled to act, but in whom he can have no confidence." *Id.* at 131–32 (citation omitted). And Representative Sedwick asked rhetorically: "Shall a man under these circumstances be saddled upon the President, who has been appointed for no other purpose but to aid the President in performing certain duties? Shall he be continued, I ask again, against the will of the President?" *Id.* at 132 (citation omitted). The broad declaratory and injunctive relief Plaintiffs seek raises just this problem.

An injunction reinstating plaintiffs would also exceed the scope of this Court's equitable powers. A federal court may grant only those equitable remedies that were "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Reinstatement of a public official is not such a remedy. "It is . . . well settled that a court of equity has no jurisdiction over the appointment and removal of public officers." *In re Sawyer*, 124 U.S. 200, 212 (1888). Instead, the Supreme Court explained, "[t]he jurisdiction to determine the title to a public office belongs exclusively to the courts of law," for instance through suits for back pay. *Id.* Thus, "the power of a court of equity to restrain by injunction the removal of a [public] officer has been denied in many well-considered cases." *Id.*; *see, e.g.*, *Baker v. Carr*, 369 U.S. 186, 231 (1962) (decisions that "held that federal equity power could not be exercised to enjoin a state proceeding to remove a public officer" or that "withheld federal equity from staying removal of a federal officer" reflect "a traditional limit upon equity jurisdiction[]"); *Walton v. House of Representatives*, 265 U.S. 487, 490 (1924) ("A court of equity has no jurisdiction over the appointment and removal of public officers."); *Harkrader v. Wadley*, 172 U.S. 148, 165 (1898)

("[T]o sustain a bill in equity to restrain . . . the removal of public officers, is to invade the domain of the courts of common law, or of the executive and administrative department of the government."); *White v. Berry*, 171 U.S. 366, 377 (1898) ("[A] court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee, nor restrain the appointment of another.") (citation omitted); *Bessent v. Dellinger*, 145 S. Ct. 515, 517 (2025) (Gorsuch, J., dissenting) (explaining that, "by the 1880s this Court considered it 'well settled that a court of equity has no jurisdiction over the appointment and removal of public officers'" (quoting *In re Sawyer*, 124 U. S. at 212)).

"Perhaps the most telling indication of the severe constitutional problem with" the remedy Plaintiffs seek "is the lack of historical precedent." *Free Enter. Fund*, 561 U.S. at 505 (citation omitted). There is no historical precedent for an Article III court to reinstate a principal officer before this year. At most, a district court in 1983 effectively reinstated removed members of the multimember U.S. Commission on Civil Rights because that court believed that the Commission functioned as a "legislative agency" whose "only purpose" was "to find facts which [could] subsequently be used as a basis for legislative or executive action"—not to exercise any executive power in its own right. *Berry v. Reagan*, No. 83-cv-3182, 1983 WL 538, at *2 (D.D.C. Nov. 14, 1983) (citations omitted), *vacated*, 732 F.2d 949 (D.C. Cir. 1983). That is no support for plaintiffs' insistence that an agency head whom the President has fired must keep exercising core Article II executive power.

      **b.  Even assuming that Plaintiffs are entitled to declaratory relief, that relief must be limited to a declaration that their removals were unlawful.**

Because a declaratory-judgment suit is "essentially an equitable cause of action," "the same equitable principles relevant to the propriety of an injunction must be taken into consideration by federal district courts in determining whether to issue a declaratory judgment." *Samuels v.*

*Mackell*, 401 U.S. 66, 70, 73 (1971) (citation omitted).  Here, that principle precludes declaratory relief that would effectively reinstate plaintiffs as Commissioners, such as a declaration that plaintiffs are and shall continue to be Commissioners.  For the same reasons that reinstatement by injunction is beyond the scope of this Court's equitable authority, reinstatement by declaratory relief is unavailable.  *See Macauley v. Waterman S.S. Corp.*, 327 U.S. 540, 545 n.4 (1946) ("The same principles which justified dismissal of the cause insofar as it sought injunction justified denial of the prayer for a declaratory judgment."); *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 300 (1943) (The Declaratory Judgment Act "only provided a new form of procedure for the adjudication of rights in conformity" with "established principles.").

## CONCLUSION

The Court should deny plaintiffs' motion for temporary restraining order.


Dated: May 26, 2025                    Respectfully submitted,

                                       YAAKOV M. ROTH
                                       Acting Assistant Attorney General

                                       ERIC J. HAMILTON
                                       Deputy Assistant Attorney General
                                       Civil Division, Federal Programs Branch

                                       /s/ *Abigail Stout*
                                       ABIGAIL STOUT
                                       (DC Bar No. 90009415)
                                       *Counsel*
                                       U.S. Department of Justice
                                       Civil Division
                                       950 Pennsylvania Avenue, NW
                                       Washington, DC 20530
                                       Telephone: (202) 514-2000
                                       Email: Abigail.Stout@usdoj.gov

                                       *Attorney for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 26, 2025, I filed the foregoing document with the Clerk of Court for the United States District Court for the District of Maryland using the court's CM/ECF filing system, which will send notification of such filing via e-mail to all counsel of record.

Respectfully submitted,

/s/ *Abigail Stout*
Abigail Stout