**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| |
|---|
| BOYLE, *et al.*, |
| Plaintiffs, |
| v. |
| TRUMP, *et al.*, |
| Defendants. |

Case No. 8:25-cv-1628-MJM

<u>**MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 1

I.      The CPSC and Its Statutory Framework............................................................. 1

II.     This Case............................................................................................................. 3

LEGAL STANDARD...................................................................................................... 4

ARGUMENT .................................................................................................................. 5

I.      Restrictions on the removal of CPSC Commissioners are inconsistent with the
        President's constitutional authority and therefore unlawful. ............................. 5

        A.      Aside from two narrow exceptions, Article II requires executive officers to
                be removable at will by the President. ..................................................... 5

        B.      The narrow *Humphrey's Executor* exception does not apply because the
                CPSC is an Executive Agency that wields substantial expective power. ............... 6

                1.      The *Humprey's Executor* exception does not apply if an agency
                        exercises substantial executive power. ....................................... 6

                2.      The CPSC exercises substantial executive power. ..................... 8

                        i.      The CPSC exercises the type of power that Supreme Court
                                caselaw recognizes as substantial and executive. .......................... 9

                        ii.     Plaintiffs' remaining arguments are unavailing........................... 15

II.     Even if the Commissioners' removal protections were constitutional, Plaintiffs are
        not entitled to reinstatement by injunction or a declaratory judgment that would
        result in reinstatement. ..................................................................................... 17

        A.      Plaintiffs are not entitled to reinstatement. ........................................... 17

        B.      Plaintiffs are not entitled to a permanent injunction............................. 21

                1.      Plaintiffs cannot establish irreparable harm because their injuries
                        could be remedied through a suit for backpay. ......................... 21

                2.      The balance of equities and public interest favor Defendants. ................. 24

        C.      Even assuming that Plaintiffs are entitled to declaratory relief, that relief
                must be limited to a declaration that their removals were unlawful..................... 26

CONCLUSION................................................................................................................ 27

# TABLE OF AUTHORITIES

## CASES

*Baker v. Carr*,
  369 U.S. 186 (1962)................................................................................................ 19

*Bauer v. Summey*,
  568 F. Supp. 3d 573 (D.S.C. 2021) ........................................................................ 22

*Berry v. Reagan*,
  No. 83-cv-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983),
  *vacated*, 732 F.2d 949 (D.C. Cir. 1983)................................................................. 20

*Bessent v. Dellinger*,
  145 S. Ct. 515 (2025).............................................................................................. 19

*Buckley v. Valeo*,
  424 U.S. 1 (1976).................................................................................................... 11

*Burns v. GAO Emps. Fed. Credit Union*,
  No. 88-cv-3424, 1988 WL 134925 (D.D.C. Dec. 2, 1988) ..................................... 22

*Cafeteria & Rest. Workers Union, Local 473 v. McElroy*,
  367 U.S. 886 (1961)................................................................................................ 26

*City of Arlington v. FCC*,
  569 U.S. 290 (2013).......................................................................................... 11, 14

*Collins v. Yellen*,
  594 U.S. 220 (2021).......................................................................................... *passim*

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
  91 F.4th 342 (5th Cir. 2024) ............................................................................. 15, 17

*Davis v. Billington*,
  76 F. Supp. 3d 59 (D.D.C. 2014) ............................................................................ 22

*Dellinger v. Bessent*,
  No. 25-5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025)................................. 24, 26

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
  952 F.2d 802 (4th Cir. 1991) .................................................................................. 21

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006)................................................................................................ 21

*EEOC v. City of Janesville*,
  630 F.2d 1254 (7th Cir. 1980) ................................................................................ 22

*Farris v. Rice*,
    453 F. Supp. 2d 76 (D.D.C. 2006) ........................................................................... 22

*Franks v. Nimmo*,
    683 F.2d 1290 (10th Cir. 1982) .............................................................................. 22

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ............................................................................... 5, 6, 20, 25

*Great Lakes Dredge & Dock Co. v. Huffman*,
    319 U.S. 293 (1943) ................................................................................................ 26

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
    527 U.S. 308 (1999) ................................................................................................ 19

*Harkrader v. Wadley*,
    172 U.S. 148 (1898) ................................................................................................ 19

*Harris v. Bessent*,
    No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) ..................................... 18

*Hetreed v. Allstate Ins. Co.*,
    135 F.3d 1155 (7th Cir. 1998) .............................................................................. 22

*Humphrey's Ex'r v. United States*,
    295 U.S. 602 (1935) .......................................................................................... *passim*

*Hunter v. Town of Mocksville, N. Carolina*,
    897 F.3d 538 (4th Cir. 2018) .................................................................................. 20

*In re Sawyer*,
    124 U.S. 200 (1888) .......................................................................................... 19, 23

*Leachco, Inc. v. Consumer Prod. Safety Comm'n*,
    103 F.4th 748 (10th Cir. 2024) ........................................................................ 15, 17

*Levesque v. Maine*,
    587 F.2d 78 (1st Cir. 1978) .................................................................................... 22

*Macauley v. Waterman S.S. Corp.*,
    327 U.S. 540 (1946) ................................................................................................ 26

*Mallory v. Norfolk Southern Railway Co.*,
    600 U.S. 122 (2023) .................................................................................................. 9

*Marxe v. Jackson*,
    833 F.2d 1121 (3d Cir. 1987) ................................................................................ 22

*Mayor of Baltimore v. Azar,*
    973 F.3d 258 (4th Cir. 2020) ................................................................. 21

*Morrison v. Olson,*
    487 U.S. 654 (1988) ..................................................................... 6, 14

*Myers v. United States,*
    272 U.S. 52 (1926) ............................................................. 7, 17, 18, 22

*Nichols v. Agency for Int'l Dev.,*
    18 F. Supp. 2d 1 (D.D.C. 1998) ............................................................ 22

*Nken v. Holder,*
    556 U.S. 418 (2009) ......................................................................... 21

*Parsons v. United States,*
    167 U.S. 324 (1897) ......................................................................... 17

*Rubino v. City of Mount Vernon,*
    707 F.2d 53 (2d Cir. 1983) .................................................................. 22

*Sampson v. Murray,*
    415 U.S. & n.68 (1974) ................................................................. 21, 26

*Samuels v. Mackell,*
    401 U.S. 66 (1971) .......................................................................... 26

*Sedar v. Reston Town Ctr. Prop., LLC,*
    988 F.3d 756 (4th Cir. 2021) ................................................................. 5

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
    591 U.S. 197 (2020) ................................................................ *passim*

*Severino v. Biden,*
    71 F.4th 1038 (D.C. Cir. 2023) .............................................................. 23

*Shurtleff v. United States,*
    189 U.S. 311 (1903) ......................................................................... 17

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) .............................................................. 23

*Trump v. United States,*
    603 U.S. 593 (2024) ......................................................................... 11

*Trump v. Wilcox,*
    No. 24A966, 2025 WL 1464804 (U.S. May 22, 2025) .................................... *passim*

*UC Health v. NLRB*,
    803 F.3d 669 (D.C. Cir. 2015) ............................................................. 14

*United States v. Arthrex, Inc.*,
    594 U.S. 1 (2021) ................................................................................. 16

*Wai Man Tom v. Hospitality Ventures LLC*,
    980 F.3d 1027 (4th Cir. 2020) ............................................................... 5

*Walton v. House of Representatives*,
    265 U.S. 487 (1924) ............................................................................. 19

*White v. Berry*,
    171 U.S. 366 (1898) ............................................................................. 19

*Wiener v. United States*,
    357 U.S. 349 (1958) ....................................................................... 17, 22

**STATUTES**

15 U.S.C. § 2051 ........................................................................................... 1

15 U.S.C. § 2053 ...................................................................................... 1, 2

15 U.S.C. § 2056 ...................................................................................... 2, 9

15 U.S.C. § 2057 ........................................................................................... 2

15 U.S.C. § 2061 .................................................................................... 3, 11

15 U.S.C. § 2064 .................................................................................... 3, 10

15 U.S.C. § 2065 ........................................................................................... 2

15 U.S.C. § 2068 .................................................................................... 2, 12

15 U.S.C. § 2069 .............................................................................. 2, 11, 12

15 U.S.C. § 2070 .................................................................................... 3, 11

15 U.S.C. § 2071 .................................................................................... 3, 11

15 U.S.C. § 2076 .................................................................................. *passim*

**RULES**

Fed. R. Civ. P. 56 ........................................................................................ 4

**REGULATIONS**

16 C.F.R. § 1025.1 ................................................................................................... 3, 10

Civil Penalties; Notice of Adjusted Maximum Amounts,
   86 Fed. Reg. 68,244 (Dec. 1, 2021) .................................................................. 11, 12

**UNITED STATES CONSTITUTION**

U.S. Const. art. II, § 1 ...................................................................................... 1, 5, 16

U.S. Const. art. II, § 3 .................................................................................. 1, 5, 16, 26

## INTRODUCTION

The Constitution vests the "'executive Power'—all of it"—in the President, who is given the sole responsibility to "take Care that the Laws be faithfully executed." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3). As the Supreme Court reaffirmed just a few weeks ago, that executive power encompasses the authority to remove those who aid the President in carrying out his duties. *See Trump v. Wilcox*, No. 24A966, 2025 WL 1464804, at *1 (U.S. May 22, 2025). Almost one month ago, the President exercised this power when he removed Plaintiffs Mary Boyle, Alexander Hoehn-Saric, and Richard Trumka, Jr. from their positions as Commissioners on the Consumer Product Safety Commission ("CPSC," "Commission," or "Agency")—an Executive Branch agency that exercises substantial executive power. Plaintiffs now challenge their removal, seeking an order that would reinstall them to their former principal offices. The Court should hold that Plaintiffs' terminations were lawful because the Commissioners' removal protections are unconstitutional. In any event, the Court should deny Plaintiffs the extraordinary relief they seek, as reinstatement is beyond the authority of any Article III court to grant.

## BACKGROUND

### I.    The CPSC and Its Statutory Framework.

In 1972, Congress established the CPSC as an "independent regulatory commission" to (1) "protect the public against unreasonable risks of injury associated with consumer products"; (2) "assist consumers in evaluating the comparative safety of consumer products"; (3) "develop uniform safety standards for consumer products and to minimize conflicting State and local regulations"; and (4) "promote research and investigation into the causes and prevention of product-related deaths, illnesses, and injuries." 15 U.S.C. §§ 2051(b), 2053(a). The Commission consists of "five Commissioners who shall be appointed by the President, by and with the advice

and consent of the Senate." *Id.* § 2053(a). Each Commissioner serves a seven-year term, and no more than three of the five Commissioners "shall be affiliated with the same political party." *Id.* § 2053(b)(1). Notably, under the Commission's enabling statute, each Commissioner enjoys removal protection: "Any member of the Commission may be removed by the President for neglect of duty or malfeasance in office but for no other cause." *Id.* § 2053(a).

The Commission wields extensive executive power. By statute, the Commission has broad rulemaking authority to "promulgate consumer product safety standards" that are "reasonably necessary to prevent or reduce an unreasonable risk of injury" associated with the consumer products. *Id.* § 2056(a). This includes the authority to completely "ban[]" certain consumer products as "hazardous" if the Commission finds that the consumer product "presents an unreasonable risk of injury" and that "no feasible consumer product safety standard . . . would adequately protect the public from the unreasonable risk of injury associated with such product." *Id.* § 2057. The Commission also has the investigative power to inspect "any factory, warehouse, or establishment in which consumer products are manufactured or held" for compliance with the Commission's rules. *Id.* § 2065(a). And the Commission has the authority to require manufacturers, private labelers, and distributors to maintain (and produce on demand) records "relevant to determining whether such manufacturer, private labeler, or distributor has acted or is acting in compliance with" the statute. *Id.* § 2065(b).

Under the statute, it is "unlawful for any person" to, among other things, manufacture or sell a consumer product that does not conform to "an applicable consumer product safety rule" or fail or refuse to make a premises and records available for inspection. *Id.* § 2068(a)(1), (3), (4). To punish violations, the Commission may seek civil penalties of up to $100,000 per violation, subject to a cap of $15 million "for any related series of violations." *Id.* §§ 2069(a)(1), (b), 2076(b)(7)(A).

With the concurrence of the Attorney General, the Commission can likewise bring criminal prosecutions that can result in up to five years' imprisonment, a fine, or both and may include the "forfeiture of assets associated with the violation." *Id.* §§ 2070(a), (c)(1), 2076(b)(7)(B). The Commission can pursue injunctive relief to "[r]estrain any violation" of its rules, *id.* § 2071(a), and also has the power to issue and enforce subpoenas through litigation, *id.* § 2076(b)(3), (c).

The Commission exercises significant power to conduct administrative adjudications. The statute allows the Commission to "conduct any hearing or other inquiry necessary or appropriate to its functions anywhere in the United States." *Id.* § 2076(a); *see also id.* § 2064(c), (d), (f). With that authority, the Commission has promulgated extensive rules that govern adjudications. 16 C.F.R. § 1025.1.

In addition, the Commission is authorized to sue in federal district court (1) against an "imminently hazardous consumer product for seizure of such product," (2) against the manufacturer, distributor, or retailer of such product, or (3) against both. 15 U.S.C. § 2061(a). Under this section of the statute, an "imminently hazardous consumer product" is "a consumer product which presents imminent and unreasonable risk of death, serious illness, or severe personal injury" for these purposes. *Id.* The Commission may file such a lawsuit whether or not there is a consumer product safety rule applicable to such product. *Id.* In suits brought under this authority, "the Commission may direct attorneys employed by it to appear and represent it." 15 U.S.C. § 2061(e).

## II.    This Case.

Plaintiffs Mary Boyle, Alexander Hoehn-Saric, and Richard Trumka, Jr. were nominated by former President Biden and confirmed by the Senate to serve as CPSC Commissioners for terms ending in October 2025, October 2027, and October 2028, respectively. ECF No. 18-2 ¶¶ 1-4. On May 8, 2025, Plaintiffs Boyle and Trumka received emails on behalf of President Trump informing

them that their positions on the CPSC were terminated effectively immediately and thanking them for their service. *Id.* at ¶ 6. On May 9, 2025, Plaintiff Hoehn-Saric was informed by Defendant Peter A. Feldman, the Acting Chairman of the Commission, that the President had terminated Plaintiff Hoehn-Saric from his role as a CPSC Commissioner. *Id.* at ¶¶ 9-10

Plaintiffs sued, arguing that their removals were ultra vires and "exceed the President's constitutional and statutory authority." ECF No. 1 ¶ 29. Plaintiffs seek (1) a declaration that "Defendants' removal of Plaintiffs from their roles as CPSC Commissioners was unlawful and that Plaintiffs are entitled to continue serving out their terms as CPSC Commissioners"; (2) an order enjoining Defendant Feldman from "obstructing Plaintiffs in any way from carrying out their duties as CPSC Commissioners, including by terminating their staff and barring their access to agency resources"; and (3) an order enjoining "Defendants Bessent, Vought, and Feldman from depriving Plaintiffs of the pay and benefits that Plaintiffs are entitled to receive as CPSC Commissioners" and "to restore all pay and benefits that have been unlawfully withheld from Plaintiffs and their staff." *Id.* ¶ 31(a), (b), (c). Plaintiffs moved for a temporary restraining order and preliminary injunction, arguing that they would be irreparably harmed absent intervention from the court. *See* ECF No. 6. After the Court denied Plaintiffs' motion for a temporary restraining order on May 27 and pursuant to the parties' agreement, the Court set an expedited briefing schedule on summary judgment. *See* May 27 TRO Hearing Tr. at 39 (declining to enter a temporary restraining order based on the "first and the final of the *Winter* factors").

## LEGAL STANDARD

Summary judgment "shall" be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" for summary-judgment purposes "if proof of its existence or non-existence would affect disposition of the case under applicable law," and a factual dispute is

"genuine" if the evidence "is such that a reasonable jury might return a verdict for the nonmovant." *Sedar v. Reston Town Ctr. Prop.*, LLC, 988 F.3d 756, 761 (4th Cir. 2021) (quoting *Wai Man Tom v. Hospitality Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## ARGUMENT

**I.    Restrictions on the removal of CPSC Commissioners are inconsistent with the President's constitutional authority and therefore unlawful.**

Plaintiffs contend that the President did not validly remove them from office because under the Agency's enabling statute, CPSC Commissioners may be removed only for "neglect of duty or malfeasance" and those kinds of tenure protections are constitutional for multimember bodies under *Humphrey's Executor*. *See* ECF No. 18-1 at 13. But CPSC Commissioners are principal officers who lead a freestanding component within the Executive Branch and exercise significant executive power. Accordingly, because the entirety of the executive power is vested in the President, *see* U.S. Const. art. II, § 1, cl. 1, the President must be able to remove CPSC Commissioners at will, and the Court should grant summary judgment for Defendants.

**A.    Aside from two narrow exceptions, Article II requires executive officers to be removable at will by the President.**

The Constitution vests all of the "executive Power" in the President, who is given sole responsibility to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3. "[A]s a general matter," the executive power encompasses "the authority to remove those who assist [the President] in carrying out his duties." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 513–14 (2010). Without such power, the President would be unable to control those who aid him in executing the laws and "could not be held fully accountable for discharging his own responsibilities." *Id.* at 514.

For nearly a century—and again as recently as a few weeks ago—the Supreme Court has repeatedly reaffirmed "the general rule that the President possesses 'the authority to remove those

who assist him in carrying out his duties.'" *Seila Law*, 591 U.S. at 215 (quoting *Free Enter. Fund.*, 561 U.S. at 514–15); *Wilcox*, 2025 WL 1464804, at *1 (granting a stay pending appeal from district court orders that enjoined the President's removal of a member of the National Labor Relations Board ("NLRB") and a member of the Merit Systems Protection Board ("MSPB")). The Supreme Court has recognized "only two exceptions to the President's unrestricted removal power"—only one of which, the *Humprey's Executor* exception, is relevant here.[1] *Seila Law*, 591 U.S. at 204, 216 (recognizing that these exceptions represent the "outermost constitutional limits of permissible congressional restrictions on the President's removal power" under current precedent (quotation omitted)). In *Humphrey's Executor*, the Supreme Court held that Congress could impose for-cause removal restrictions on "a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Id.* at 216.

**B.    The narrow *Humphrey's Executor* exception does not apply because the CPSC is an Executive Agency that wields substantial expective power.**

1.    The *Humprey's Executor* exception does not apply if an agency exercises substantial executive power.

The *Humphrey's Executor* exception does not apply to the CPSC because the CPSC is an Executive Agency that exercises substantial executive power. In *Humphrey's Executor*, the Supreme Court upheld the constitutionality of a provision prohibiting removal of 1935 Federal Trade Commission ("FTC") Commissioners absent "inefficiency, neglect of duty, or malfeasance in office." *Humphrey's Ex'r v. United States*, 295 U.S. 602, 623 (1935). Despite reaffirming the

---

[1] Plaintiffs do not argue that *Morrison v. Olson*, 487 U.S. 654 (1988), controls. In *Morrison*, the Supreme Court recognized a removal exception "for inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 591 U.S. at 218. CPSC Commissioners are principal officers who lead a freestanding component of the executive branch, so the *Morrison* exception does not apply.

then-recent holding of *Myers v. United States*, 272 U.S. 52 (1926), that the President "has unrestrictable power . . . to remove purely executive officers," *id.* at 632, *Humphrey's Executor* concluded that *Myers* did not control because the FTC Commissioner at issue was "an officer who occupies no place in the executive department and who exercises no part of the executive power vested by the Constitution in the President," *id.* at 628. Instead, *Humphrey's Executor* understood the 1935 FTC to be "an administrative body" that "carr[ied] into effect legislative policies" and "perform[ed] other specified duties as a legislative or as a judicial aid." *Id.* Those duties, according to the Court, "c[ould] not in any proper sense be characterized as an arm or an eye of the executive." *Id.* The Court thus understood the 1935 FTC not to be exercising executive power at all but rather to "act[] in part quasi legislatively and in part quasi judicially." *Id.* On that understanding, *Humphrey's Executor* found no constitutional problem with restricting the removal of FTC Commissioners in 1935.

*Seila Law* made clear that *Humprey's Executor* is limited to "multimember bodies with 'quasi-judicial' or 'quasi-legislative' functions" that exercise no executive power. *Seila Law*, 591 U.S. at 216–17 (quoting *Humphrey's Ex'r*, 295 U.S. at 632). In *Seila Law*, the Supreme Court held that the structure of the Consumer Financial Protection Bureau ("CFPB"), under which the Director could not be removed except for inefficiency, neglect, or malfeasance, was unconstitutional. 591 U.S. at 203–05. The Court explained that unlike "the 1935 FTC," the CFPB had three types of power that were indisputably executive, as discussed further below. *Id.* at 218–19. In addition, the Court noted that the CFPB was headed by a "single director." *Id.* The CFPB thus lacked both elements that are required for the *Humphrey's Executor* exception to apply: It "wield[ed] substantial executive power," and it was not a "multimember" agency. *Id.* at 218.

Plaintiffs argue that Defendants "misunderstand the role that the 'substantiality' of an independent agency's powers plays in the constitutional analysis." ECF No. 18-1 at 20. Not true. *Seila Law* explained that *Humphrey's Executor* applies at most to "multimember expert agencies that do not wield substantial executive power"—meaning *Humphrey's Executor* does *not* apply to multimember expert agencies that *do* wield substantial executive power. *Seila Law*, 591 U.S. at 218. Accordingly, the *Humprey's Executor* exception implicates two elements: a "multimember" agency and "substantial executive power." *Wilcox* confirmed that the structure of an agency as a multimember board alone is not enough for *Humprey's Executor* to apply. There, the two boards at issue—the NLRB and MSPB—are both multimember boards with staggered terms, just like the 1935 FTC in *Humprey's Executor* and just like the CPSC. Instead of treating the presence of a multimember agency as dispositive or automatically applying *Humprey's Executor*, the Supreme Court stayed the district court's orders that enjoined the President's removal of the two board members, explaining that the "stay reflects [its] judgment that the Government is likely to show that both the NLRB and MSPB exercise considerable executive power." *Wilcox*, 2025 WL 1464804, at *1. Accordingly, Supreme Court caselaw teaches that both are required for the *Humprey's Executor* exception to be met: (1) a multimember board that (2) does not wield substantial executive power. *See Seila Law*, 591 U.S. at 218.

2.    <u>The CPSC exercises substantial executive power.</u>

Unlike the 1935 FTC in *Humphrey's Executor*, the CPSC is no "mere legislative or judicial aid." *Id.* Rather, the CPSC exercises significant executive power. Although Plaintiffs argue that *Humphrey's Executor* governs this dispute and likens the 1935 FTC to the 2025 CPSC, the two

agencies—and the analysis of the two agencies' powers under Supreme Court precedent—could not be further apart.[2]

> i.  *The CPSC exercises the type of power that Supreme Court caselaw recognizes as substantial and executive.*

In *Seila Law*, the Supreme Court held that the structure of the Consumer Financial Protection Bureau ("CFPB"), under which the Director could not be removed except for inefficiency, neglect, or malfeasance, was unconstitutional. *Seila Law*, 591 U.S. at 203–05. The Court explained that unlike "the 1935 FTC," the CFPB had three types of power that were indisputably executive. *Id.* at 218–19. First, the CFPB had "the authority to promulgate binding rules fleshing out 19 federal statutes, including a broad prohibition on unfair and deceptive practices in a major segment of the U. S. economy." *Id.* at 218. Second, the CFPB could "unilaterally issue final decisions awarding legal and equitable relief in administrative adjudications." *Id.* at 219. And third, the CFPB's "enforcement authority include[d] the power to seek monetary penalties against private parties on behalf of the United States in federal court—a quintessentially executive power not considered in *Humphrey's Executor*." *Id.*

Although the CPSC is a multimember agency, it wields each of the three types of power that the Supreme Court found to be indisputably executive in *Seila Law*. First, the Commission wields broad rulemaking authority, including the massive power to "promulgate consumer product safety standards." 15 U.S.C. § 2056(a). Agency rulemakings "are exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power.'" *Seila Law*, 591 U.S. at

---

[2] The government acknowledges that *Humphrey's Executor* is binding on this Court as to the 1935 FTC until overturned by the Supreme Court, *see Mallory v. Norfolk Southern Railway Co.*, 600 U.S. 122, 136 (2023), but it preserves the argument that *Humphrey's Executor* was wrongly decided, *see, e.g.*, *Seila Law*, 591 U.S. at 239–51 (Thomas and Gorsuch, JJ., concurring in part) (advocating for the Court to "reconsider Humphrey's Executor in toto").

216 n.2 (quotation omitted); *see id* at 218. Because "interpreting a law enacted by Congress to implement the legislative mandate is the very essence of execution of the law," an agency "empowered to issue a 'regulation or order' . . . clearly exercises executive power." *Collins v. Yellen*, 594 U.S. 220, 254 (2021) (cleaned up). And that is particularly true because the CPSC "possesses the authority to promulgate binding rules fleshing out" numerous "federal statutes" implicating "major segment[s] of the U.S. economy," *Seila Law*, 591 U.S. at 218, including children's toys to infant products to portable generators to garage doors to flammability of clothing to nearly every consumer product in between. Indeed, the vast scope of the CPSC's regulatory authority—which includes the authority to promulgate consumer product safety standards implicating tens of thousands of consumer products—confirms that the Commission exercises significant executive power. *See id.*; *see Collins*, 594 U.S. at 253 ("[Federal Housing Finance Agency ('FHFA')] actions with respect to those companies could have an immediate impact on millions of private individuals and the economy at large.").

Second, the Commission has standalone authority to conduct administrative adjudications. 15 U.S.C. § 2076(a); 16 C.F.R. § 1025.1. The Commission can exercise the executive power to "unilaterally issue final decisions awarding . . . relief in administrative adjudications." *Seila Law*, 591 U.S. at 219; *see* 15 U.S.C. §§ 2064(c), (d), 2076(a). For example, if the Commission makes certain determinations, it may, after a hearing, order a manufacturer, distributor, or retailer of the product to "cease distribution" and "give public notice of the defect or failure to comply." *Id.* § 2064(c)(1)(A). The Commission also has the authority to order that manufacturer, distributor, or retailer to take certain remedial steps, such as "repair[ing] the defect," "replac[ing] such product," or "refund[ing] the purchase price." *Id.* § 2064(d). *Seila Law* recognized that this type of agency adjudication "*must be*" a form of executive power. 591 U.S. at 216 n.2 (quotation omitted). Even

though it takes a "'judicial' form[]," a binding "adjudication" conducted by an agency without an Article III judge can be justified only as part of the executive's authority to "administer" a statutory scheme. *City of Arlington v. FCC*, 569 U.S. 290, 307, 304 n.4 (2013).

Third, the Commission possesses broad enforcement powers that are similar to the CFPB's. For example, like the CFPB, the CPSC has the authority to conduct investigations and issue and enforce subpoenas. *See* 15 U.S.C. § 2076(b)(3), (c). These are quintessential executive functions: "Investigative and prosecutorial decisionmaking is 'the special province of the Executive Branch,' and the Constitution vests the entirety of the executive power in the President." *Trump v. United States*, 603 U.S. 593, 620 (2024) (citations omitted); *see also Buckley v. Valeo*, 424 U.S. 1, 138–40 (1976) (recognizing interpreting and enforcing law through litigation as executive function); *Collins*, 594 U.S. at 254 (explaining that the FHFA "clearly exercises executive power" where it is authorized to issue subpoenas, among other things); *see* 15 U.S.C. § 2076(b)(3), (c) (granting the Commission authority to issue subpoenas and enforce them through litigation).

The Commission also has the power to enforce federal law by bringing both civil and criminal actions in federal court. It can bring suits seeking both injunctive relief and penalties of up to $120,000 per violation, and it can initiate criminal prosecutions that can result in up to five years' imprisonment.[3] *See* 15 U.S.C. §§ 2069, 2070(a), 2071(a), 2076(b)(7); 86 Fed. Reg. 68,244.

---

[3] Under Section 12 of the Consumer Product Safety Act, the Commission "may direct attorneys employed by it to appear and represent it" in a federal court action seeking a declaration that a product is an "imminently hazardous consumer product" and temporary or permanent injunction relief, such as "a mandatory order requiring the notification of such risk to purchasers of such product known to the defendant, public notice, the recall, the repair or the replacement of, or refund for, such product." 15 U.S.C. § 2061(a), (b), (e). For other civil cases, the Commission has the power to "initiate, prosecute, defend, or appeal (other than to the Supreme Court), through its own legal representative and in the name of the Commission any civil action" if the Attorney General does not notify the Commission within 45 days that the Attorney General will represent the Commission. 15 U.S.C. § 2076(b)(7)(A). Likewise, for criminal cases, the Commission has the power to "initiate, prosecute, or appeal, through its own legal representative, with the concurrence

This, by itself, is enough to render the *Humphrey's Executor* exception inapplicable because, as the Supreme Court has recognized, such enforcement authority is "a quintessentially executive power not considered in *Humphrey's Executor*." *Seila Law*, 591 U.S. at 219. This enforcement authority also includes the power to seek daunting monetary penalties against private parties on behalf of the United States in federal court"—another "quintessentially executive power not considered in *Humphrey's Executor*." *Seila Law*, 591 U.S. at 219. Indeed, if an entity distributes a consumer product that is not in conformity with an applicable consumer product safety rule, the Commission can go to court to impose civil penalties of up to $120,000 for each violation. 15 U.S.C. §§ 2068(a)(1), 2069(a)(1), (b), 2076(b)(7)(A); 86 Fed. Reg. 68,244.

As all three of these different authorities make clear, the Commission wields substantial executive power from top to bottom. Plaintiffs insist that the 1935 FTC exercised the same powers as the CPSC today. *See* ECF No. 18-1 at 18 (asserting that the CPSC's powers "closely resemble the powers considered in *Humphrey's Executor*"). Plaintiffs point to the 1935 FTC's authority to "issue substantive regulations," its "wide powers of investigation," and its authority to "conduct administrative adjudications" to argue that the 1935 FTC and the CPSC wield the same powers, but Plaintiffs grossly overread *Humprey's Executor*.

The Supreme Court did not even mention "rules" or "regulations" in its opinion—much less rely on the 1935 FTC's potential authority to issue substantive regulations in its analysis or discussion of executive power. *See generally Humphrey's Ex'r*, 295 U.S. 602. And although the Court described the 1935 FTC's "wide powers of investigation" in the facts section of the opinion, in its analysis, the *Humprey's Executor* Court merely noted that the 1935 FTC "acts as a legislative

---

of the Attorney General or through the Attorney General, any criminal action." 15 U.S.C. § 2076(b)(7)(B). Requiring Attorney General concurrence or cooperation does not diminish the undoubtably executive nature of this statutory authority.

agency" when "making investigations and reports thereon for the information of Congress." *Id.* at 621, 628. This is a far cry from *Seila Law*'s or *Collins*'s descriptions of investigatory power, which the CPSC mirrors. *See, e.g.*, *Seila Law*, 591 U.S. at 206-07; *see id.* (explaining that the CFPB is modeled after the CPSC); *Collins*, 594 U.S. at 230. Likewise, *Humprey's Executor*'s analysis of the 1935 FTC's administrative adjudications is limited to observing that the 1935 FTC acts as an "agency of the judiciary" when it acts "as a master in chancery under rules prescribed by the court." *Humphrey's Ex'r*, 295 U.S. 628. Finally, Plaintiffs argue that the 1935 FTC also possessed the authority to issue and enforce subpoenas. ECF No. 18-1 at 19. But the Supreme Court did not consider or analyze this power at all. *See generally Humphrey's Executor* 295 U.S. 602 (failing to mention or analyze the FTC's subpoena power).

In short, Plaintiffs attempt to expand the limited exception in *Humprey's Executor*'s by pointing to potential 1935 FTC powers the Supreme Court did not meaningfully consider in its opinion. But the Supreme Court rejected this argument when the *Seila Law* dissenters advanced it, explaining: "Perhaps the FTC possessed broader rulemaking, enforcement, and adjudicatory powers than the *Humphrey's* Court appreciated. Perhaps not. Either way, what matters is the set of powers the Court considered as the basis for its decision, not any latent powers that the agency may have had not alluded to by the Court." *Seila Law*, 591 U.S. at 219 n.4. And the set of powers the Court actually considered in *Humphrey's Executor* were limited: the "FTC (as it existed in 1935) . . . was 'an administrative body' that performed 'specified duties as a legislative or as a judicial aid.' It acted 'as a legislative agency' in 'making investigations and reports' to Congress and 'as an agency of the judiciary' in making recommendations to courts as a master in chancery." *Id.* at 216 (quoting *Humphrey's Executor*, 295 U.S. at 628).

*Humphrey's Executor* "limited its holding 'to officers of the kind here under consideration,'" as "the contours of the *Humphrey's Executor* exception depend upon the characteristics of the agency before the Court." *Seila Law*, 591 U.S. at 215 (citation omitted). This makes good sense; a judicial decision relates only "to a detailed set of facts." *UC Health v. NLRB*, 803 F.3d 669, 682 (D.C. Cir. 2015) (Edwards, J., concurring) (collecting cases). As with any decision, *Humphrey's Executor* dealt with a particular set of facts—those of the "1935 FTC" and the "New Deal-era FTC," as the Supreme Court repeatedly specified in *Seila Law*. 591 U.S. at 218; *see also Collins*, 594 U.S. at 278-88 (Sotomayor, J., concurring) (contrasting FHFA with the "1935 FTC" at issue in *Humphrey's Executor*). Accordingly, the question is not whether *Humphrey's Executor* remains good law, but whether the Supreme Court's characterization of a 1935 FTC Commissioner—the characterization on which its holding rested—is applicable to the CPSC today. On that score, Plaintiffs cannot seriously contend that *Humphrey's Executor*'s description of a 1935 FTC Commissioner as "an officer who occupies no place in the executive department and who exercises no part of the executive power vested by the Constitution in the President," 295 U.S. at 628, accurately describes a present-day CPSC Commissioner. Indeed, the Supreme Court has since suggested that *Humphrey's Executor*'s conclusion that the FTC did not wield executive authority was simply incorrect. *See Seila Law*, 591 U.S. at 216 n.2 ("The Court's conclusion that the FTC did not exercise executive power has not withstood the test of time."); *Morrison*, 487 U.S. at 689 n.28 ("[I]t is hard to dispute that the powers of the FTC at the time of Humphrey's Executor would at the present time be considered 'executive,' at least to some degree."); *Arlington*, 569 U.S. at 305 n.4.

Accordingly, the government has shown that the CPSC's powers are substantial and easily exceed the level of executive power that the 1935 FTC wielded—which the Supreme Court

described as acting merely "as a legislative agency" in "making investigations and reports" to Congress and "as an agency of the judiciary" in making recommendations to courts as a master in chancery. *Selia Law*, 591 U.S. at 215-16. Tellingly, that is what every court to analyze the question has concluded. *See, e.g., Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 353–54 (5th Cir. 2024) (concluding the CPSC wields substantial executive power); *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 761 (10th Cir. 2024) (agreeing with the Fifth Circuit that the CPSC wields substantial executive power). And that is what the Supreme Court concluded about the CFPB, an agency modeled after the CPSC. *Selia Law*, 591 U.S. at 205-07.

ii.   *Plaintiffs' remaining arguments are unavailing.*

The CPSC wields substantial executive power such that it comfortably fits into the general rule that the President may remove principal officers at will—rather than *Humphrey's Executor*'s narrow exception. Plaintiffs' remaining arguments to the contrary are unavailing.

As explained *supra*, the *Humprey's Executor* exception applies if a multimember agency exercises "substantial executive power." *See Seila Law*, 591 U.S. at 218. Plaintiffs resist this reading of *Seila Law*, arguing that the exercise of substantial power creates a constitutional problem only for "an independent director 'acting alone.'" ECF No. 18-1 at 17 (quoting *Seila Law*, 591 U.S. at 238 (emphasis omitted)). Namely, Plaintiffs point to the Supreme Court's discussion of remedy—which was joined by only a plurality of the Court—to suggest that converting the CFPB into a multimember agency would remedy the constitutional problem. *Id.* (quoting *Seila Law*, 591 U.S. at 237). But this view misreads *Seila Law* and swaps the Supreme Court's conclusion by the majority of the Court for pure speculation by a plurality of the Court.

Plaintiffs' reliance on a single sentence from the remedies analysis in *Seila Law* to suggest that every multimember body falls within the *Humphrey's Executor* exception regardless of the

- 15 -

executive powers it wields cannot be reconciled with the Supreme Court's reasoning throughout that case. That reasoning made clear that the *Humphrey's Executor* exception extends only to "a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Seila Law*, 591 U.S. at 216 (emphasis added); *id.* at 239 (Thomas, J., concurring in part) (recognizing this limitation). Indeed, *Seila Law* focused repeatedly on the nature of the agency's power, not the structure of the agency exercising that power. *See, e.g., id.* at 218 (explaining *Humphrey's Executor* extends at most to "multimember expert agencies that do not wield substantial executive power"); *id.* at 217 (similar). That makes sense given that Article II vests all executive power in the President and assigns him the responsibility to take care that the laws are faithfully executed. U.S. Const. art. II, §§ 1, 3. The President, and the President alone, is accountable to the American people for how he performs his duties, which ensures that the Executive Branch reflects the people's electoral judgments. But that "line[] of accountability" is blurred if unelected subordinates can wield the President's power without having to answer to him—whether those subordinates act alone or in a multimember body. *United States v. Arthrex, Inc.*, 594 U.S. 1, 16 (2021).

And rather than "reject[] the idea that the constitutionality of an agency's for-cause removal protections depends on the substantiality of the powers the agency exercises," as Plaintiffs appear to urge this Court to do, the Supreme Court has reaffirmed the importance of substantial executive powers in cases like *Collins* and *Wilcox*. *See Collins*, 594 U.S. 220, 254 (2021) (holding the structure of the Federal Housing Finance Agency—an "independent agency" tasked with regulating companies and, if necessary, stepping in as their conservator or receiver—violates the separation of powers where the Agency "clearly exercises executive power"); *Wilcox*, 2025 WL

1464804, at *1 (explaining that the "stay reflects [the Court's] judgment that the Government is likely to show that both the NLRB and MSPB exercise considerable executive power").

And although Plaintiffs point to the Fifth and Tenth Circuit decisions for support, those decisions undermine Plaintiffs on this point because they both agreed that the Commission exercises substantial executive power. *Consumers' Rsch.*, 91 F.4th at 353–54; *Leachco*, 103 F.4th at 761. Moreover, as explained in Defendants' opposition to Plaintiffs' motion for a temporary restraining order, *see* ECF No. 15 at 12-14, this Court should not follow the decisions of the Fifth or Tenth Circuits because they were wrongly decided and do not properly apply *Seila Law*. *See Consumers' Rsch.*, 91 F.4th at 346; *Leachco*, 103 F.4th at 761. *See also* May 27 TRO Hearing Tr. at 37 (finding the Fifth and Tenth Circuit decisions to be poorly reasoned and unpersuasive).

II.    **Even if the Commissioners' removal protections were constitutional, Plaintiffs are not entitled to reinstatement by injunction or a declaratory judgment that would result in reinstatement.**

As explained above, President Trump lawfully exercised his Article II authority to remove his subordinates when he removed Plaintiffs. But even if Plaintiffs prevail on the merits, this Court should deny the broad relief that Plaintiffs seek, including reinstatement by injunction or declaratory relief that would result in reinstatement.

A.    **Plaintiffs are not entitled to reinstatement.**

This Court lacks the power to issue any order reinstating principal executive officers removed by the President. Traditionally, executive officers challenging their removal by the President have sought back pay, not reinstatement. *See Wiener v. United States*, 357 U.S. 349, 350 (1958) (suit "for recovery of his salary"); *Humphrey's Executor*, 295 U.S. at 612 (suit "to recover a sum of money alleged to be due . . . for salary"); *Myers*, 272 U.S. at 106 (suit "for his salary from the date of his removal"); *Shurtleff v. United States*, 189 U.S. 311, 318 (1903) (suit "for salary"); *Parsons v. United States*, 167 U.S. 324, 326 (1897) (suit "for salary and fees"). That rule reflects

- 17 -

the obvious separation of powers problems that arise if a court attempts to reinstate—that is, reappoint—a principal executive officer removed by the President. The President cannot be compelled to retain the services of a principal officer whom he no longer believes should be entrusted with the exercise of executive power. *Harris v. Bessent*, No. 25-5037, 2025 WL 1021435, at *4 (D.C. Cir. Apr. 7, 2025) (Rao, J., dissenting) ("The government is likely to succeed on its remedial challenge because the injunctive relief concocted by the district court is wholly unprecedented and transgresses historical limits on our equitable authority."). And the courts may not exercise the appointment power for principal officers, which the Constitution vests in the President alone.

Indeed, many members of the First Congress argued against requiring the Senate's advice and consent for removals precisely because of the risk that such a procedure would require the President to retain someone he had sought to remove. As Representative Benson observed: "If the Senate, upon its meeting, were to acquit the officer, and replace him in his station, the President would then have a man forced on him whom he considered as unfaithful." *Myers*, 272 U.S. at 124 (citation omitted). Representative Boudinot argued: "But suppose [the Senate] shall decide in favor of the officer, what a situation is the President then in, surrounded by officers with whom, by his situation, he is compelled to act, but in whom he can have no confidence." *Id.* at 131–32 (citation omitted). And Representative Sedwick asked rhetorically: "Shall a man under these circumstances be saddled upon the President, who has been appointed for no other purpose but to aid the President in performing certain duties? Shall he be continued, I ask again, against the will of the President?" *Id.* at 132 (citation omitted). The broad declaratory and injunctive relief Plaintiffs seek raises just this problem.

An injunction reinstating plaintiffs would also exceed the scope of this Court's equitable powers. A federal court may grant only those equitable remedies that were "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Reinstatement of a public official is not such a remedy. "It is . . . well settled that a court of equity has no jurisdiction over the appointment and removal of public officers." *In re Sawyer*, 124 U.S. 200, 212 (1888). Instead, the Supreme Court explained, "[t]he jurisdiction to determine the title to a public office belongs exclusively to the courts of law," for instance through suits for back pay. *Id.* Thus, "the power of a court of equity to restrain by injunction the removal of a [public] officer has been denied in many well-considered cases." *Id.*; *see, e.g.*, *Baker v. Carr*, 369 U.S. 186, 231 (1962) (decisions that "held that federal equity power could not be exercised to enjoin a state proceeding to remove a public officer" or that "withheld federal equity from staying removal of a federal officer" reflect "a traditional limit upon equity jurisdiction[]"); *Walton v. House of Representatives*, 265 U.S. 487, 490 (1924) ("A court of equity has no jurisdiction over the appointment and removal of public officers."); *Harkrader v. Wadley*, 172 U.S. 148, 165 (1898) ("[T]o sustain a bill in equity to restrain . . . the removal of public officers, is to invade the domain of the courts of common law, or of the executive and administrative department of the government."); *White v. Berry*, 171 U.S. 366, 377 (1898) ("[A] court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee, nor restrain the appointment of another.") (citation omitted); *Bessent v. Dellinger*, 145 S. Ct. 515, 517 (2025) (Gorsuch, J., dissenting) (explaining that, "by the 1880s this Court considered it 'well settled that a court of equity has no jurisdiction over the appointment and removal of public officers'" (quoting *In re Sawyer*, 124 U. S. at 212)).

"Perhaps the most telling indication of the severe constitutional problem with" the remedy Plaintiffs seek "is the lack of historical precedent." *Free Enter. Fund*, 561 U.S. at 505 (citation omitted). There is no historical precedent for an Article III court to reinstate a principal officer before this year. At most, a district court in 1983 effectively reinstated removed members of the multimember U.S. Commission on Civil Rights because that court believed that the Commission functioned as a "legislative agency" whose "only purpose" was "to find facts which [could] subsequently be used as a basis for legislative or executive action"—not to exercise any executive power in its own right. *Berry v. Reagan*, No. 83-cv-3182, 1983 WL 538, at *2 (D.D.C. Nov. 14, 1983) (citations omitted), *vacated*, 732 F.2d 949 (D.C. Cir. 1983). That is no support for Plaintiffs' insistence that an agency principal whom the President has fired must keep exercising core Article II executive power.

Plaintiffs argue that courts "routinely exercise their equitable power to order reinstatement after reaching a final determination that a termination was unlawful." ECF No. 18-1 at 22. But none of the cases cited address executive officers or implicate Article II removal powers. *Id.*; *see, e.g.*, *Hunter v. Town of Mocksville, N. Carolina*, 897 F.3d 538, 562 (4th Cir. 2018) (explaining that the district court denied plaintiff's request for reinstatement, cautioning that certain circumstances can make reinstatement impossible or inappropriate).

Finally, Plaintiff argues that equitable relief is necessary here to further Congress's objective of insulating the Commissioners from political influence. ECF No. 18-1 at 23. But that is the point. Congress's statutory removal protections are exactly the type of unconstitutional shields that the Supreme Court has concluded violates the separation of powers. *See, e.g.*, *Seila Law*, 591 U.S. at 224, 232; *Collins*, 594 U.S. at 252; *Free Enter. Fund*, 561 U.S. at 487-98.

Insulation from the President's supervision—and through him the will of the electorate—blocks the very political accountability enshrined in our constitutional system.

**B.      Plaintiffs are not entitled to a permanent injunction.**

Where the relief sought includes a permanent injunction, a party that has established success on the merits must additionally demonstrate that "(1) 'it has suffered an irreparable injury'; (2) 'remedies available at law, such as monetary damages, are inadequate to compensate for that injury'; (3) 'considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted'; and (4) 'the public interest would not be disserved by a permanent injunction.'" *Mayor of Baltimore v. Azar*, 973 F.3d 258, 274 (4th Cir. 2020) (en banc) (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). The third and fourth factors of the analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

> 1.      <u>Plaintiffs cannot establish irreparable harm because their injuries could be remedied through a suit for backpay.</u>

Apart from their failure to show a likelihood of success on the merits, Plaintiffs cannot show irreparable harm. *See Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (requiring a "clear showing" of likelihood of irreparable harm). Plaintiffs' showing on this essential element fails because they have not shown harm of the magnitude necessary to justify extraordinary emergency relief. Plaintiffs argue they will suffer "irreparable harm if they remain barred from exercising their duties as Commissioners," which cannot be redressed through money damages because they will "lose the opportunity to fulfill their statutory mandates." ECF No. 18-1 at 20. But plaintiffs cite no injury of a kind that the Supreme Court has recognized as irreparable in this context. *See Sampson v. Murray*, 415 U.S. at 92 & n.68 (1974) (holding that, except in "genuinely extraordinary situation," loss of income and reputation do not amount to irreparable

harm). Rather, courts across the country have concluded that loss of employment does not constitute irreparable harm. *See, e.g.*, *Bauer v. Summey*, 568 F. Supp. 3d 573, 604 (D.S.C. 2021) ("[L]oss of employment is not considered to be an irreparable injury because it is fully compensable by monetary damages."); *Hetreed v. Allstate Ins. Co.*, 135 F.3d 1155, 1158 (7th Cir. 1998); *Davis v. Billington*, 76 F. Supp. 3d 59, 65–66 (D.D.C. 2014) (collecting cases); *Farris v. Rice*, 453 F. Supp. 2d 76, 79–80 (D.D.C. 2006) ("cases are legion holding that loss of employment does not constitute irreparable injury").

Indeed, courts have repeatedly rejected the notion that the deprivation of a unique, singular, or high-level position is any more of an irreparable injury. *See Hetreed*, 135 F.3d at 1158 (loss of position as senior manager leading audit department not irreparable injury); *Marxe v. Jackson*, 833 F.2d 1121, 1122 (3d Cir. 1987) (division manager); *Rubino v. City of Mount Vernon*, 707 F.2d 53 (2d Cir. 1983) (mayoral-appointed City Assessor); *Franks v. Nimmo*, 683 F.2d 1290, 1291 (10th Cir. 1982) (Associate Chief of Staff for Research and Development position at Department of Veterans Affairs Medical Center); *EEOC v. City of Janesville*, 630 F.2d 1254, 1256 (7th Cir. 1980) (Chief of Police); *Levesque v. Maine*, 587 F.2d 78, 79 (1st Cir. 1978) (Maine Commissioner of Manpower); *Nichols v. Agency for Int'l Dev.*, 18 F. Supp. 2d 1, 2, 4 (D.D.C. 1998) (Chief of Information Management Systems, Office of Inspector General); *Burns v. GAO Emps. Fed. Credit Union*, No. 88-cv-3424, 1988 WL 134925, at *1–2 (D.D.C. Dec. 2, 1988) (President of Credit Union Board of Directors). Accordingly, when principal officers have been removed from their posts, they generally have challenged those removals in suits for back pay. *See Humphrey's Executor*, 295 U.S. at 612 (challenge sought "to recover a sum of money alleged to be due"); *Myers*, 272 U.S. at 106 (same); *Wiener*, 357 U.S. at 349–51 (same). Remedies at law thus exist and could make plaintiffs whole here, foreclosing any showing of irreparable harm.

The few district court cases that Plaintiffs cite do not change the result. Those cases are out-of-circuit, non-binding district court cases that are from the last few months.[4] ECF No. 18-1 at 20–21. And these cases are far from settled.[5] Additionally, they largely predate *Wilcox*, in which the Supreme Court recently stayed a district court's orders requiring reinstatement and cautioned against the "disruptive effect" of "repeated removal and reinstatement of officers during the pendency" of litigation. *Wilcox*, 2025 WL 1464804, at *1.

Plaintiffs' argument that they suffer irreparable harm because "they will forever lose the opportunity to fulfill their statutory mandates" fares no better. ECF No. 18-1 at 20. First, this is not the type of injury that the Supreme Court has recognized as irreparable in this context. *See Wilcox*, 2025 WL 1464804, at *1 ("The stay also reflects our judgment that the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty.") And second, plaintiffs' argument proves the merits point. The premise underlying plaintiffs' argument is that they do not want to miss out on the opportunity to oppose the President's agenda

---

[4] Plaintiffs also cite *Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023), and *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996), in passing, ECF No. 18-1 at 26, but neither case stands for the sort of relief that Plaintiffs seek. In neither case did the Court review, much less sustain, a request like the ones presented here. Rather, the Court considered only its *jurisdiction* over an official's challenge to his removal. Those cases cannot be read to have rejected the separate longstanding principle that equitable power may not be used to "restrain by injunction the removal of a [public] officer," *In re Sawyer*, 124 U.S. at 212, a principle not briefed or addressed in either of those cases. Thus, although *Swan* and *Severino* may help Plaintiffs establish standing, they do not justify the relief sought here.

[5] *See, e.g.*, *Dellinger v. Bessent*, Case No. 1:25-cv-385 (D.D.C. Mar. 31, 2025) (minute order closing the case and dismissing it with prejudge after plaintiff dismissed his appeal and the D.C. Circuit vacated the district court's order); *LeBlanc v. U.S. Privacy & Civil Liberties Oversight Bd.*, Case No. 1:25-cv-00542 (D.D.C.), on appeal No. 25-5197 (ordering expedited briefing on motion for a stay pending appeal which will be complete by June 11); *Grundmann v. Trump*, Case No. 1:25-cv-425, on appeal No. 25-5165.

- 23 -

and decisions that may be made to advance the President's directives. But this is the impetus behind Article II's removal power: Article II vests the President with the power to supervise and remove those who wield executive power on his behalf to maintain control over the Executive Branch. The President's accountability to the people is only possible through the Executive Branch being fully accountable to the President. Potentially missing out on the opportunity to oppose the President's proposals does not—and cannot, consistent with our constitutional structure— constitute irreparable harm.

2.    The balance of equities and public interest favor Defendants.

The balance of the equities and public interest weigh strongly against reinstating Plaintiffs as Commissioners of the CPSC. Because the Commission is an executive agency exercising executive power, an injunction effectively reinstating three of its principal officers would raise grave separation-of-powers concerns and work a great and irreparable harm to the Executive. *See Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *12 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting) (describing how "direct[ing] the President to recognize and work with an agency head whom he has already removed" "impinges on the 'conclusive and preclusive' power through which the President controls the Executive Branch that he is responsible for supervising" and thus causes irreparable harm). Indeed, the recent *Wilcox* stay order from the Supreme Court teaches that, in removal cases, the "Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." *Wilcox*, 2025 WL 1464804, at *1; *see also* May 27 TRO Hearing Tr. at 39 (explaining that Plaintiffs have been "effectively terminated" and are asking for reinstatement, which raises the concern expressed in the *Wilcox* order and tends to tip the balance of equities in favor of the Government in this case").

The balance tilts in the Defendants' favor for very good reason. The President cannot be compelled to retain the services of principal officers whom the President no longer believes should be entrusted with the exercise of executive power. Imposing such a remedy would prevent the President from implementing his electoral mandate through his subordinates and undermine the accountability of the Executive Branch enshrined in the Constitution. The President "is elected by the entire Nation" and all executive officers "remain[] subject to the ongoing supervision and control of the elected President." *Seila Law*, 591 U.S. at 224. Adding additional exceptions to that constitutional rule—and then reinstating principal officers subject to those additional exceptions— "heightens the concern that" the Executive Branch "may slip from the Executive's control, and thus from that of the people." *Free Enter. Fund*, 561 U.S. at 499. That result is an affront to the Constitution and to the American people, who elected the President to manage the Executive Branch of their government.

The public interest is better served by Commissioners who hold the President's confidence and, accordingly, will more effectively serve him in executing his duties as Chief Executive. Plaintiffs' motion for summary judgment—which explains that Plaintiffs seek to be reinstated so they can vote against particular Commission initiatives implementing the President's agenda, *see* ECF No. 18-1 at 10-11—proves this very point. For example, even before Plaintiffs' removals, Plaintiffs had opposed a motion "to direct staff to submit a draft notice of proposed rulemaking to the Office of Information and Regulatory Affairs ("OIRA") pursuant to Executive Order 14215, *Ensuring Accountability for All Agencies* (Feb. 18, 2025) and an Office of Management and Budget ("OMB") memorandum. *See* Exhibit A at 1-2. Reinstating Plaintiffs will result in the government incurring harm from removed officers continuing to exercise the executive power that *Wilcox* warned about. 2025 WL 1464804, at *1.

"[T]he Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'" *Sampson*, 415 U.S. at 83 (quoting *Cafeteria & Rest. Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 896 (1961)). "Allowing another branch of government to insulate executive officers from presidential control . . . would sever a key constitutional link between the People and their government," contrary to the public interest. *Dellinger*, 2025 WL 559669 at *17 (Katsas, J., dissenting). Thus, Plaintiffs' claimed equities cannot outweigh the grave and unprecedented harm an injunction would cause to the separation of powers and the President's authority to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

### C. Even assuming that Plaintiffs are entitled to declaratory relief, that relief must be limited to a declaration that their removals were unlawful.

Because a declaratory-judgment suit is "essentially an equitable cause of action," "the same equitable principles relevant to the propriety of an injunction must be taken into consideration by federal district courts in determining whether to issue a declaratory judgment." *Samuels v. Mackell*, 401 U.S. 66, 70, 73 (1971) (citation omitted). Here, that principle precludes declaratory relief that would effectively reinstate Plaintiffs as Commissioners, such as a declaration that Plaintiffs are and shall continue to be Commissioners. For the same reasons that reinstatement by injunction is beyond the scope of this Court's equitable authority, reinstatement by declaratory relief is unavailable. *See Macauley v. Waterman S.S. Corp.*, 327 U.S. 540, 545 n.4 (1946) ("The same principles which justified dismissal of the cause insofar as it sought injunction justified denial of the prayer for a declaratory judgment."); *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 300 (1943) (The Declaratory Judgment Act "only provided a new form of procedure for the adjudication of rights in conformity" with "established principles.").

**CONCLUSION**

The Court should grant Defendants' cross-motion for summary judgment and deny Plaintiffs' motion for summary judgment.


Dated: June 4, 2025                          Respectfully submitted,

                                             YAAKOV M. ROTH
                                             Acting Assistant Attorney General

                                             ERIC J. HAMILTON
                                             Deputy Assistant Attorney General
                                             Civil Division, Federal Programs Branch

                                             /s/ *Abigail Stout*
                                             ABIGAIL STOUT
                                             (DC Bar No. 90009415)
                                             *Counsel*
                                             U.S. Department of Justice
                                             Civil Division
                                             950 Pennsylvania Avenue, NW
                                             Washington, DC 20530
                                             Telephone: (202) 514-2000
                                             Email: Abigail.Stout@usdoj.gov

                                             *Attorney for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2025, I filed the foregoing document with the Clerk of Court for the United States District Court for the District of Maryland using the court's CM/ECF filing system, which will send notification of such filing via e-mail to all counsel of record.

Respectfully submitted,

/s/ *Abigail Stout*

Abigail Stout