## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **MARY BOYLE**, *et al.*, | * | |
| **Plaintiffs**, | * | |
| **v.** | * | **Civ. No. MJM-25-1628** |
| **DONALD J. TRUMP**, in his official capacity as President of the United States, *et al.*, | * | |
| **Defendants**. | * | |

\* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiffs Mary Boyle, Alexander Hoehn-Saric, and Richard Trumka Jr. (collectively, "Plaintiffs") were appointed to serve as members of the United States Consumer Product Safety Commission ("CPSC") for terms prescribed by statute, subject to removal only for neglect of duty or malfeasance. On May 8 and 9, 2025, Plaintiffs received notifications sent on behalf of President Donald J. Trump purporting to terminate them from their positions without cause. Thereafter, Plaintiffs were denied access to facilities and resources necessary to fulfill their roles as CPSC Commissioners, and members of Plaintiffs' staff were discharged.

On May 21, 2025, Plaintiffs commenced this civil action for declaratory and injunctive relief against President Trump; Scott Bessent, Secretary of the Treasury; Russell Vought, Director of the Office of Management and Budget; and Peter A. Feldman, Acting Chairman of the CPSC (collectively, "Defendants"). Plaintiffs seek a declaratory judgment that their terminations were unlawful and an injunction against official action to effectuate their removal from office.

Defendants contend that the statute requiring cause for Plaintiffs' removal is inconsistent with the President's removal power under Article II of the U.S. Constitution and therefore invalid.

This matter is before the Court on the parties' cross-motions for summary judgment. On June 6, 2025, following expedited briefing, the Court conducted a hearing on the motions and took them under advisement. For the reasons set forth below, the Court finds no constitutional defect in the statutory restriction on Plaintiffs' removal and that Plaintiffs' purported removal from office was unlawful. The Court shall enter an Order granting Plaintiffs' motion, denying Defendants' motion, and providing declaratory and injunctive relief permitting Plaintiffs to resume their duties as CPSC Commissioners.

## I.    BACKGROUND

### A. Purpose, Functions, and Organization of the Consumer Product Safety Commission

In 1972, Congress passed the Consumer Product Safety Act ("CPSA"), Pub. L. No. 92-573, 86 Stat. 1207, and created the CPSC to advance the goals and purposes of the Act, 15 U.S.C. § 2053(a). The CPSA's purposes include (1) "protect[ing] the public against unreasonable risks of injury associated with consumer products;" (2) "assist[ing] consumers in evaluating the comparative safety of consumer products;" (3) "develop[ing] uniform safety standards for consumer products . . . ;" and (4) "promot[ing] research and investigation into the causes and prevention of product-related deaths, illnesses, and injuries." *Id.* § 2051(b). The CPSC consists of five Commissioners nominated by the President and confirmed by the Senate. *Id.* § 2053(a). Each Commissioner must hold "background and expertise in areas related to consumer products and protection of the public from risks to safety." *Id.* The CPSC has the statutory authority to promulgate product-safety standards, *id.* § 2056(a); to conduct administrative proceedings and investigations, with the power to issue and enforce subpoenas, *id.* §§ 2064, 2076(a), (b)(3), (c);

and to initiate civil and criminal actions in federal court to enforce consumer product safety laws, *see id.* §§ 2069, 2070(a), 2071(a), 2076(b)(7); among other functions and powers.

Congress established the CPSC as an "independent regulatory commission," *id.* § 2053(a), to ensure that it remained an expert body "unfettered by political dictates, self-interested industry pressure or blind consumer zeal," 122 Cong. Rec. S15211 (daily ed. May 24, 1976). Specific statutory guardrails were enacted to protect the Commission from political pressures, abrupt changes in composition, and loss of agency expertise. First, Congress provided that the Commissioners would serve staggered, seven-year terms, 15 U.S.C. § 2053(b)(1), and that any Commissioner appointed to fill a vacancy created by the premature departure of a predecessor would be appointed only for the remainder of the predecessor's term, *id.* § 2053(b)(2).[1] Second, Congress provided that "[n]ot more than three of the Commissioners shall be affiliated with the same political party." *Id.* § 2053(c). Third, and critical to the case here, Congress provided that the Commissioners may be "removed by the President" before the expiration of their terms only "for neglect of duty or malfeasance in office but for no other cause." *Id.* § 2053(a).

### B.  Plaintiffs' Purported Removal

The facts relevant to this case are uncontested. *See* ECF No. 21-2 (Defendants' Statement of Undisputed Material Facts, raising no dispute with Plaintiffs' Statement of Undisputed Material Facts, ECF No. 18-2). Each Plaintiff was nominated by President Joseph R. Biden and confirmed by the U.S. Senate to serve as a Commissioner of the CPSC. ECF No. 18-2, ¶ 1. Plaintiff Boyle was confirmed on June 2, 2022, to serve out the remainder of her predecessor's term, set to expire on October 27, 2025. *Id.* ¶ 2. Plaintiff Hoehn-Saric was confirmed on October 7, 2021, to serve

---

[1] A Commissioner appointed to serve out their predecessor's term may "continue to serve after the expiration of this term until his successor has taken office" or up to a maximum of one year. 15 U.S.C. § 2053(b)(2).

out the remainder of his predecessor's term, set to expire on October 27, 2027. *Id.* ¶ 3. Plaintiff Trumka was confirmed on November 16, 2021, to serve a full seven-year term expiring on October 27, 2028. *Id.* ¶ 4. Each Plaintiff has a substantial professional background in the field of consumer protection and the work of the CPSC. *See* ECF No. 6-2, ¶ 1; ECF No. 6-3, ¶ 1; ECF No. 6-4, ¶ 1. Plaintiffs have performed ably in their roles and have never been accused of neglect of duty or malfeasance in office by either President Trump or President Biden. ECF No. 18-2, ¶ 5.

Between May 8 and May 9, 2025, Plaintiffs were notified of their removal from their positions as three of the CPSC's five sitting Commissioners. On May 8, Plaintiffs Boyle and Trumka each received an email from Trent Morse, the Deputy Director of Presidential Personnel, which stated, in full: "On behalf of President Donald J. Trump, I am writing to inform you that your position on the Consumer Product Safety Commission is terminated effective immediately. Thank you for your service." *Id.* ¶¶ 6–7. The following day, Plaintiff Hoehn-Saric and two of his staff members attempted to access their offices at the CPSC headquarters[2] but were barred by CPSC security. *Id.* ¶ 9. While waiting in the lobby, Plaintiff Hoehn-Saric received a phone call from Acting Chairman Feldman, who informed him that President Trump had terminated him from his role as a CPSC Commissioner. *Id.* ¶ 10.

Since May 9, Plaintiffs have been unable to enter their offices unescorted, log in to the CPSC computer network, and access their CPSC email accounts and electronic files. *Id.* ¶ 13. Plaintiffs were required to return their CPSC identification badges, keys, phones, credit cards, and computer equipment. *Id.* ¶ 14. Plaintiffs' staff members have also received termination notices that cite Plaintiffs' removal from office as the basis for termination. *Id.* Plaintiffs have received

---

[2] CPSC headquarters is located in Bethesda, Maryland. ECF No. 1, ¶ 6.

"separation packages" and understand that they will no longer be receiving the pay and benefits to which CPSC Commissioners are entitled. *Id.* ¶ 15.

### C. Procedural History

On May 21, 2025, Plaintiffs filed a Complaint for Declaratory and Injunctive Relief against Defendants Trump, Bessent, Vought, and Feldman, in their official capacities. ECF No. 1. On the same date, Plaintiffs filed a Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. ECF No. 6. This motion seeks preliminary injunctive relief to prevent Defendants Bessent, Vought, and Feldman from "taking any action to effectuate President Donald J. Trump's purported termination of Plaintiffs from their roles as Commissioners of the [CPSC.]" ECF No. 6-5. Defendants filed a response in opposition to the motion on May 26, 2025. ECF No. 15.

On May 27, 2025, the Court conducted a hearing on Plaintiffs' request for a TRO and declined to issue temporary or preliminary injunctive relief. With the parties' agreement, the Court entered an Order setting a schedule for expedited briefing of Plaintiffs' motion for summary judgment. ECF No. 17. Thereafter, Plaintiffs filed a motion for summary judgment, ECF No. 18; Defendants filed a cross-motion for summary judgment and response in opposition to Plaintiffs' motion, ECF No. 21; and Plaintiffs filed a reply, ECF No. 22. On June 6, 2025, the Court conducted a hearing on the motions and took them under advisement.

Plaintiffs' central claim in this litigation is that Defendants acted ultra vires and in violation of the CPSA by removing them as CPSC Commissioners without cause and taking action to effectuate the purported terminations. ECF Nos. 18, 18-1 (Plaintiffs' Motion and Memorandum). Plaintiffs seek two forms of relief. First, Plaintiffs request a declaration that the "purported termination of Plaintiffs from their roles as [CPSC] Commissioners" is unlawful and "without legal effect." ECF No. 18-6 (proposed order). Second, Plaintiffs seek to enjoin Defendants

Bessent, Vought, and Feldman from "taking any action to effectuate the unlawful terminations
. . . ." *Id.* In their cross-motion for summary judgment, Defendants primarily argue that the
statutory for-cause restriction on the removal of CPSC Commissioners is inconsistent with the
President's Article II removal authority and therefore unconstitutional. ECF Nos. 21, 21-1
(Defendants' Motion and Memorandum). Defendants also argue that relief in the form of
reinstatement is beyond the authority of this Court. Defs.' Mem. at 1.

## II.    STANDARD OF REVIEW

A court may grant a party's summary judgment motion under Rule 56 if "the movant shows
that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a
matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.
Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir.
2020). A fact is "material" if it "might affect the outcome of the suit under the governing law[,]"
and a genuine issue of material fact exists "if the evidence is such that a reasonable jury could
return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106
S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) (emphasis omitted); *see also Raynor v. Pugh*, 817 F.3d
123, 130 (4th Cir. 2016). A party can establish the absence or presence of a genuinely disputed
fact through "particular parts of materials in the record, including depositions, documents,
electronically stored information, affidavits or declarations, stipulations (including those made for
purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ.
P. 56(c)(1)(A). The court must view all the facts, including reasonable inferences to be drawn from
them, in the light most favorable to the nonmovant, *Matsushita Elec. Indus. Co. v. Zenith Radio
Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), but the court is not

permitted to weigh the evidence, make credibility determinations, or decide the truth of disputed facts. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2510–11.

## III.    RELEVANT CASE LAW

Article II of the U.S. Constitution vests "[t]he executive Power" in the President, who "shall take Care that the Laws be faithfully executed[.]" The President's "executive Power" under Article II "generally includes the ability to remove executive officials, for it is 'only the authority that can remove' such officials that they 'must fear and, in the performance of [their] functions, obey.'" *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 213–14, 140 S. Ct. 2183, 2197, 207 L. Ed. 2d 494 (2020) (quoting *Bowsher v. Synar*, 478 U.S. 714, 726, 106 S. Ct. 3181, 3188, 92 L. Ed. 2d 583 (1986)); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 513–14, 130 S. Ct. 3138, 3164, 177 L. Ed. 2d 706 (2010) ("The Constitution that makes the President accountable to the people for executing the laws also gives him the power to do so. That power includes, as a general matter, the authority to remove those who assist him in carrying out his duties."); *Collins v. Yellen*, 594 U.S. 220, 252, 141 S. Ct. 1761, 1784, 210 L. Ed. 2d 432 (2021) ("The removal power helps the President maintain a degree of control over the subordinates he needs to carry out his duties as the head of the Executive Branch, and it works to ensure that these subordinates serve the people effectively and in accordance with the policies that the people presumably elected the President to promote."). For Congress "to draw to itself . . . the power to remove or the right to participate in the exercise of that power" would "infringe the constitutional principle of the separation of governmental powers." *Myers v. United States*, 272 U.S. 52, 161, 47 S. Ct. 21, 40, 71 L. Ed. 160 (1926).

But the President's power of removal is not absolute. The U.S. Supreme Court has recognized two exceptions that "represent what up to now have been the outermost constitutional

limits of permissible congressional restrictions on the President's removal power." *Seila Law*, 591 U.S. at 218, 140 S. Ct. at 2200 (quoting *PHH Corp. v. CFPB*, 881 F.3d 75, 196 (D.C. Cir. 2018) (Kavanaugh, J., dissenting)). First, in *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S. Ct. 869, 79 L. Ed. 1611 (1935), and *Wiener v. United States*, 357 U.S. 349, 78 S. Ct. 1275, 2 L. Ed. 2d 1377 (1958), the Supreme Court upheld tenure protections for officers of "multimember bodies with 'quasi-judicial' or 'quasi-legislative' functions[.]" *Seila Law*, 591 U.S. at 216–17, 140 S. Ct. at 2198–99. Second, in *United States v. Perkins*, 116 U.S. 483, 6 S. Ct. 449, 29 L. Ed. 700 (1886), and *Morrison v. Olson*, 487 U.S. 654, 108 S. Ct. 2597, 101 L. Ed. 2d 569 (1988), the Supreme Court upheld tenure protections for "inferior officers with limited duties and no policymaking or administrative authority[.]" *Seila Law*, 591 U.S. at 217–18, 140 S. Ct. at 2199–200. Only the exception first recognized in *Humphrey's Executor* is at issue here.

### A. *Humphrey's Executor* and its progeny

In *Humphrey's Executor*, the Supreme Court unanimously upheld a statutory provision preventing the President from removing members of the Federal Trade Commission ("FTC") except for "inefficiency, neglect of duty, or malfeasance in office." 295 U.S. at 619, 55 S. Ct. at 870 (quoting 15 U.S.C. § 41). "Whether the power of the President to remove an officer shall prevail over the authority of Congress to condition the power by fixing a definite term and precluding a removal except for cause will depend upon the character of the office[.]" *Id.* at 631, 55 S. Ct. at 875, *quoted in Morrison*, 487 U.S. at 687, 108 S. Ct. at 2617. Examining the features of the FTC, the Court described this Commission as "an administrative body created by Congress to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed, and to perform other specified duties as a legislative or as a judicial aid." *Humphrey's Executor*, 295 U.S. at 628, 55 S. Ct. at 874. "Such a body[,]" the Court stated,

"[could not] in any proper sense be characterized as an arm or an eye of the executive[,]" noting that it performed its duties "without executive leave and, in the contemplation of the statute, . . . free from executive control." *Id.* The Commission was meant to be "nonpartisan" and "act with entire impartiality." *Id.* at 624, 55 S. Ct. at 872. The Court described the FTC's duties as "neither political nor executive," but instead called for "the trained judgment of a body of experts" "informed by experience." *Id.*

Considering the powers and functions of the FTC, the Court described them as "quasi legislative" in part and "quasi judicial" in part. *Id.* at 628, 55 U.S. at 874. The FTC acted "as a legislative agency" in "making investigations and reports" to Congress and "as an agency of the judiciary[]" in making recommendations to courts "as a master in chancery . . . ." *Id.*, *quoted in Seila Law*, 591 U.S. at 215, 140 S. Ct. at 2198. To the extent that the FTC exercised any "executive function," it was distinguishable from "executive power in the constitutional sense," as the FTC exercised executive functions "in the discharge and effectuation of its quasi legislative or quasi judicial powers, or as an agency of the legislative or judicial departments of the government."[3] *Humphrey's Executor*, 295 U.S. at 628, 50 S. Ct. at 874.

The Court then concluded that the President does not possess an "illimitable" power to remove officers like the members of the FTC, stating as follows:

> The authority of Congress, in creating quasi legislative or quasi judicial agencies, to require them to act in discharge of their duties independently of executive control cannot well be doubted; and that authority includes, as an appropriate incident, power to fix the period during which they shall continue, and to forbid their removal except for cause in the meantime. For it is quite evident that one who holds his office only during the pleasure of another cannot be

---

[3] In *Morrison v. Olson*, the Supreme Court called into doubt its conclusion in *Humphrey's Executor* that the FTC did not exercise executive power. 487 U.S. at 690 n.28, 108 S. Ct. at 2618 n.28, *cited in Seila Law*, 591 U.S. at 216 n.2, 140 S. Ct. at 2198 n.2.

> depended upon to maintain an attitude of independence against the
> latter's will.

*Id.* at 629, 55 S. Ct. at 874.

Two decades later, in *Wiener*, the Supreme Court applied its holding in *Humphrey's Executor* to uphold a suit for backpay by a member of the War Claims Commission who claimed that he was unlawfully discharged without cause. *Wiener*, 357 U.S. at 356, 78 S. Ct. at 1279. The statute that created this Commission provided that its three members were to be "appointed by the President, by and with the advice and consent of the Senate." *Id.* at 350, 78 S Ct. at 1276. The statute included "no provision for removal of a Commissioner[,]" but it prescribed that the Commission would exist and conduct its work for a limited term. *Id.* While recognizing the President's general removal power announced in *Myers*, the Court in *Wiener* viewed *Humphrey's Executor* as "narrowly confin[ing] the scope of the *Myers* decision to include only 'all purely executive officers.'" *Id.* at 352, 78 S. Ct. at 1277 (quoting *Humphrey's Executor*, 295 U.S. at 628, 55 S. Ct. at 874). Following the reasoning in *Humphrey's Executor*, the Court examined the character of the War Claims Commission and described it as "an adjudicatory body" intended to be independent of executive control. *Id.* at 353–56, 78 S. Ct. at 1278–79. The Court ultimately rejected "the claim that the President could remove a member of an adjudicatory body like the War Claims Commission merely because he wanted his own appointees on such a Commission[.]" *Id.* at 356, 78 S. Ct. at 1279. "[N]o such power is given to the President directly by the Constitution, and none is impliedly conferred upon him by statute simply because Congress said nothing about it." *Id.*

At each opportunity since *Wiener*, the Supreme Court has declined to overturn *Humphrey's Executor*. *See, e.g.*, *Free Enterprise Fund*, 561 U.S. at 483–84, 130 S. Ct. at 3146–47 (reviewing constitutional limits on the President's removal power and stating, "The parties do not ask us to

reexamine any of these precedents, and we do not do so."); *Seila Law*, 591 U.S. at 228, 140 S. Ct. at 2206 ("While we do not revisit *Humphrey's Executor* or any other precedent today, we decline to elevate it into a freestanding invitation for Congress to impose additional restrictions on the President's removal authority."). The Court has, however, reconsidered and recast some views articulated in *Humphrey's Executor* and *Wiener*. In *Morrison*, for instance, the Court recognized the "difficulty of defining" "executive" as a category and stated that "the determination of whether the Constitution allows Congress to impose a 'good cause'-type restriction on the President's power to remove an official cannot be made to turn on whether or not that official is classified as 'purely executive.'" 487 U.S. at 689, 108 S. Ct. at 2618; *see id.* at 487 U.S. at 689 n.28, 108 S. Ct. at 2618 n.28.

### B. *Seila Law*

More recently, in *Seila Law*, the Supreme Court declined to extend the *Humphrey's Executor* exception to justify statutory tenure protection for the sole director of the Consumer Financial Protection Bureau ("CFPB"). *Seila Law*, 591 U.S. at 220–32. 140 S. Ct. at 2201–07. Unlike the multimember Commissions at issue in *Humphrey's Executor* and *Wiener*, the CFPB was structured, by statute, under the leadership of a single director appointed to serve a term of five years and who could only be removed for "inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3). The Court held that this statutory protection against removal ran afoul of the President's Article II removal power. *Seila Law*, 591 U.S. at 213, 140 S. Ct. at 2197.

As relevant here, the Supreme Court in *Seila Law* first held that *Humphrey's Executor* did not resolve the question of whether the CFPB Director's tenure protection was constitutional. *Id.* at 218–20, 140 S. Ct. at 2199–201. Foremost, the Court noted structural differences between the 2020 CFPB and the 1935 FTC at issue in *Humphrey's Executor*:

> Unlike the New Deal-era FTC upheld [in *Humphrey's Executor*], the CFPB is led by a single Director who cannot be described as a "body of experts" and cannot be considered "non-partisan" in the same sense as a group of officials drawn from both sides of the aisle. 295 U.S. at 624, 55 S. Ct. 869. Moreover, while the staggered terms of the FTC Commissioners prevented complete turnovers in agency leadership and guaranteed that there would always be some Commissioners who had accrued significant expertise, the CFPB's single-Director structure and five-year term guarantee abrupt shifts in agency leadership and with it the loss of accumulated expertise.

*Id.* at 218, 140 S. Ct. at 2200. The Court then considered the governmental powers entrusted to the CFPB's single Director, noting that this single office carried rulemaking authority to administer 19 federal statutes, as well as "unilateral[]" powers to "issue final decisions awarding legal and equitable relief in administrative adjudications" and "to seek daunting monetary penalties against private parties on behalf of the United States in federal court[.]" *Id.* at 218–19, 140 S. Ct. at 2200.

The Supreme Court ultimately declined to exempt the CFPB Director from the President's general removal power, concluding that "an independent agency led by a single Director and vested with significant executive power . . . has no basis in history and no place in our constitutional structure." *Id.* at 220, 140 S. Ct. at 2201. Throughout its analysis, the Court repeatedly emphasized the concentration of the CFPB's "significant governmental power in the hands of a single individual accountable to no one." *Id.* at 224, 140 S. Ct. at 2203. The Court suggested that "the most telling indication of [the CFPB's] severe constitutional problem" was its "almost wholly unprecedented" structure. *Id.* at 220, 140 S. Ct. at 2201. The Court noted that there were only a few "isolated" examples of good-cause tenure protections for "principal officers who wield power alone rather than as members of a board or commission." *Id.* "In addition to being a historical anomaly, the CFPB's single-Director configuration is incompatible with our constitutional structure. Aside from the sole exception of the Presidency, that structure

scrupulously avoids concentrating power in the hands of any single individual." *Id.* at 222–23, 140 S. Ct. at 2202.

Not only was the CFPB Director entrusted with an array of policymaking and enforcement powers "[w]ith no colleagues to persuade, and no boss or electorate looking over her shoulder," but other unique statutory features of the agency further insulated the Director from the electorally accountable President. *Id.* at 225, 140 S. Ct. at 2204. First, the Director's five-year term would leave some Presidents with no opportunity "to shape [the CFPB's] leadership and thereby influence its activities." *Id.* And the single-Director leadership structure gave Presidents no opportunity "to appoint any other leaders—such as a chair or fellow members of a Commission or Board—who [could] serve as a check on the Director's authority and help bring the agency in line with the President's preferred policies." *Id.* Second, unlike most independent agencies, the CFPB receives its funding outside of the normal appropriations process and therefore beyond the President's influence over appropriations. *Id.* at 226, 140 S. Ct. at 2204. Indeed, "the Director receives [funds for the CFPB] from the Federal Reserve, which is itself funded outside of the annual appropriations process" and beyond the control of the electorate. *Id.*

In consideration of the foregoing, the Court held that the CFPB Director's statutory tenure protection was unconstitutional. *Id.* at 220, 140 S. Ct. at 2201.

## IV.  PLAINTIFFS' REMOVAL FROM OFFICE

### A.  Violation of 15 U.S.C. § 2053(a)

No material facts are disputed in this case. *See* ECF Nos. 18-2, 21-2.[4] On May 8 and May 9, 2025, Plaintiffs received notifications on behalf of President Trump purporting to remove them

---

[4] Plaintiffs' Statement of Undisputed Facts, ECF No. 18-2, is supported by sworn declarations and exhibits provided by each Plaintiff, ECF Nos. 6-2, 6-3, 6-4, 18-3, 18-4, 18-5. Defendants do not dispute Plaintiffs' Statement. *See* ECF No. 21-2.

from their duly appointed positions as three of five sitting Commissioners of the CPSC. ECF No. 18-2, ¶¶ 6–7, 10. Since their purported terminations, Plaintiffs have been prevented from returning to their offices at CPSC headquarters without an escort and accessing CPSC resources necessary to perform their statutorily mandated duties. *Id.* ¶¶ 13–14. No Plaintiff has finished serving their term. *Id.* ¶¶ 1–4; *see also* 15 U.S.C. § 2053(b) (prescribing CPSC Commissioners' terms). By statute, the President could only remove Plaintiffs from their positions as CPSC Commissioners "for neglect of duty or malfeasance in office . . . ." 15 U.S.C. § 2053(a). But no Plaintiff has neglected their official duties, committed official malfeasance, or been accused of any neglect of duty or malfeasance. ECF No. 18-2, ¶ 5. Therefore, Plaintiffs' purported removals from office and efforts to prevent them from fulfilling their statutory duties as CPSC Commissioners violated 15 U.S.C. § 2053(a).

Although this case presents no material factual disputes, the contested legal issue central to this case is whether Plaintiffs' statutory tenure protection in 15 U.S.C. § 2053(a) infringes upon the President's Article II removal power. This Court holds that § 2053(a) is not inconsistent with Article II, agreeing with several other courts that statutory tenure protection for CPSC Commissioners is constitutionally justified by the *Humphrey's Executor* exception to the President's removal power. *See Consumers' Research v. CPSC*, 91 F.4th 342, 351–56 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 414, 220 L. Ed. 2d 170 (2024); *Leachco, Inc. v. CPSC*, 103 F.4th 748, 762–62 (10th Cir. 2024), *cert. denied*, 145 S. Ct. 104 (2025); *United States v. SunSetter Prods. LP*, 2024 WL 1116062, at *2–4 (D. Mass. Mar. 14, 2024).

**B. Constitutionality of the Statutory For-Cause Removal Protections in 15 U.S.C. § 2053(a)**

"[W]hether Congress can 'condition the [President's power of removal] by fixing a definite term and precluding a removal except for cause, will depend upon the character of the office.'"

*Morrison*, 487 U.S. at 687, 108 S. Ct. at 2617 (quoting *Humphrey's Executor*, 295 U.S. at 631, 55 S. Ct. at 875). "Because the Court limited its holding [in *Humphrey's Executor*] 'to officers of the kind here under consideration,' [295 U.S.] at 632, 55 S. Ct. 869, the contours of the *Humphrey's Executor* exception [to the President's removal power] depend upon the characteristics of the agency before the Court." *Seila Law*, 591 U.S. at 215, 140 S. Ct. at 2198. Specifically, "*Humphrey's Executor* permitted Congress to give for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Id.* at 216, 140 S. Ct. at 2199; *but see Morrison*, 487 U.S. at 689, 108 S. Ct. at 2618 ("[T]he determination of whether the Constitution allows Congress to impose a 'good cause'-type restriction on the President's power to remove an official cannot be made to turn on whether or not that official is classified as 'purely executive.'").

Although *Humphrey's Executor's* characterization of the FTC in 1935 as non-executive has not withstood the test of time, *see id.* at 690, 108 S. Ct. at 2619, n.28, "[t]he Court identified several organizational features that helped explain [this] characterization[,]" *Seila Law*, 591 U.S. at 216, 140 S. Ct. at 2198–99:

> Composed of five members—no more than three from the same political party—the Board was designed to be "non-partisan" and to "act with entire impartiality." [*Humphrey's Executor*, 295 U.S.] at 624, 55 S. Ct. 869; *see id.*, at 619–620, 55 S. Ct. 869. The FTC's duties were "neither political nor executive," but instead called for "the trained judgment of a body of experts" "informed by experience." *Id.*, at 624, 55 S. Ct. 869 (internal quotation marks omitted). And the Commissioners' staggered, seven-year terms enabled the agency to accumulate technical expertise and avoid a "complete change" in leadership "at any one time." *Ibid*.

*Id. Humphrey's Executor* remains good law and is binding on this Court, and, for reasons explained below, the Court finds that it applies to the CPSC.

First, the organization of the CPSC mirrors that of the FTC. The CPSC is "a multimember body of experts, balanced along partisan lines" and appointed to serve "staggered, seven-year terms . . . ." *Id.*; *see also* 15 U.S.C. 2053(a) (providing that the CPSC shall "consist[] of five Commissioners" who hold "background and expertise in areas related to consumer products and protection of the public from risks to safety"); *id.* § 2053(b) (assigning staggered seven-year terms to CPSC Commissioners, providing that "[a]ny Commissioner appointed to fill a vacancy occurring prior to the expiration of the term for which his predecessor was appointed shall be appointed only for the remainder of such term"); *id.* § 2053(c) (providing that "[n]ot more than three of the [CPSC] Commissioners shall be affiliated with the same political party"). These structural features the CPSC shares with the FTC help the agency perform its functions impartially, ensures that it retains its expertise, and "avoid[s] a 'complete change' in leadership 'at any one time.'" *Seila Law*, 591 U.S. at 216, 140 S. Ct. at 2198–99 (quoting *Humphrey's Executor*, 295 U.S. at 624, 55 S. Ct. at 872).

Like that of the FTC, the CPSC's structure stands in stark contrast to the "anomalous" single-Director organization of the CFPB that the Supreme Court deemed unconstitutional in *Seila Law*. *See Seila Law*, 591 U.S. at 213–32, 140 S. Ct. at 2197–2207; *Consumers' Research*, 91 F.4th at 354 (describing "CFPB's *single-Director* structure" as "the defining feature that the Supreme Court in *Seila Law* relied on to hold the CFPB unconstitutional"). Unlike the CFPB's single-Director structure, the bipartisan, multimember structure of the CPSC and the FTC permits each Commissioner's authority to be checked by the others, encourages group deliberation and consensus building, and prevents any one Commissioner from holding an outsized amount of power. *See Seila Law*, 591 U.S. at 224–25, 140 S. Ct. at 2203–04 (noting that CFPB's Director has "no colleagues to persuade," and the CFPB's structure "vest[s] significant governmental power

in the hands" of a sole Director and does not permit opportunities for the Director's authority to be checked by "a chair or fellow members of a Commission or Board").

While sharing the FTC's organizational features, the CPSC also performs functions similar or identical to those of the FTC which, in 1935, *Humphrey's Executor* described as "quasi legislative and quasi judicial."[5] *Humphrey's Executor*, 295 U.S. at 629, 55 S. Ct. at 874. Both the FTC and CPSC hold "wide powers of investigation in respect of" private parties within their

---

[5] In *Morrison*, the Supreme Court explained that "the characterization of the agencies in *Humphrey's Executor* and *Wiener* as 'quasi-legislative' or 'quasi-judicial' in large part reflected our judgment that it was not essential to the President's proper execution of his Article II powers that these agencies be headed up by individuals who were removable at will." *Morrison*, 487 U.S. at 690–91, 108 S. Ct. at 2619. The Supreme Court's reasons for concluding in *Humphrey's Executor* that the power to remove FTC Commissioners at will was not essential to the President's authority under Article II are fully applicable to the CPSC Commissioners in the instant case.

The *Morrison* Court further stated, in a footnote, that *Humphrey's Executor*'s and *Wiener*'s use of the terms "quasi-legislative" and "quasi-judicial" may also "describe the circumstances in which Congress might be more inclined to find that a degree of independence from the Executive, such as that afforded by a 'good cause' removal standard, is necessary to the proper functioning of the agency or official." *Id.* at 691 n.30, 108 S. Ct. at 2619 n.30; *see also Humphrey's Executor*, 295 U.S. at 629, 55 S. Ct. at 874 ("The authority of Congress, in creating quasi legislative or quasi judicial agencies, to require them to act in discharge of their duties *independently of executive control* cannot well be doubted; and that authority includes, as an appropriate incident, power to fix the period during which they shall continue, and *to forbid their removal except for cause in the meantime*." (emphasis added)).

Here, like the FTC in *Humphrey's Executor* and the War Claims Commission in *Wiener*, Congress constituted the CPSC to serve as an "independent regulatory commission," 15 U.S.C. § 2053(a), to ensure that it remained an expert body "unfettered by political dictates, self-interested industry pressure or blind consumer zeal," 122 Cong. Rec. S15211 (daily ed. May 24, 1976); *see also Humphrey's Executor*, 295 U.S. at 628, 55 S. Ct. at 874 ("[FTC's] duties are performed without executive leave and, in the contemplation of the statute, must be free from executive control."); *Wiener*, 357 U.S. at 353–56, 78 S. Ct. at 1278–79 (emphasizing independence of War Claims Commission). The removal restriction for CPSC Commissioners in 15 U.S.C. § 2053(a) reflects and serves Congress's intent that this Commission—like those at issue in *Humphrey's Executor* and *Wiener*—maintain "a degree of independence from the Executive" as "necessary to the proper functioning of the [Commission]." *Morrison*, 487 U.S. at 691 n.30, 108 S. Ct. at 2619 n.30. And, as explained herein, the Court concludes that 15 U.S.C. § 2053(a) serves the legislative purpose of supporting the CPSC's independence, expertise, and impartiality without obstructing "the President's proper execution of his Article II powers" and duties. *Morrison*, 487 U.S. at 689–90, 108 S. Ct. at 2618.

regulatory ambit. *Id.* at 621, 55 S. Ct. at 871 (citing 15 U.S.C. § 46, prescribing authority of FTC to conduct investigations of individuals and corporations); 15 U.S.C. § 2076 (granting CPSC investigatory powers). And both Commissions have the authority to issue substantive rules and regulations to carry out the objectives of the statutes within their purview. *See* Federal Trade Commission Act, Pub. L. No. 63-203, § 6(g), 38 Stat. 717, 722 (1914), *codified as amended at* 15 U.S.C. § 46(g) (empowering FTC "to make rules and regulations for the purpose of carrying out the provisions of this Act"); 15 U.S.C. § 2056(a) (empowering CPSC to promulgate "consumer product safety standards").[6] Both the FTC and the CPSC are authorized to enforce the statutes they administer and conduct administrative adjudications as prescribed in those statutes. *See Humphrey's Executor*, 295 U.S. at 620–21, 55 S. Ct. at 870–71 (citing 15 U.S.C. § 45, authorizing and directing FTC "to prevent" private parties "from using unfair methods of competition in commerce" by issuing complaints alleging violations, conducting hearings, making factual findings, issuing orders, and seeking any further relief in federal court); 15 U.S.C. §§ 2061, 2064(c)–(d) (authorizing the CPSC to file actions for seizure of "imminently hazardous consumer product[s]" and to order remedial measures upon finding a substantial product hazard).

Defendants emphasize the CPSC's authority to enforce the laws within its jurisdiction through enforcement actions in federal court, which the *Seila Law* Court called "a quintessentially executive power not considered in *Humphrey's Executor*." Defs.' Mem. at 11–12 (quoting *Seila Law*, 591 U.S. at 219, 140 S. Ct. at 2200). However, the CPSC's authority to prosecute civil and criminal enforcement actions in federal court is restricted by the consent and involvement of the

---

[6] Defendants argue that *Humphrey's Executor* did not mention the 1935 FTC's authority to issue substantive regulations, much less rely on this authority in its discussion of executive power. Defs.' Mem. at 12. However, the FTC's rulemaking authority is plain on the face the Federal Trade Commission Act, which is cited and heavily relied upon in *Humphrey's Executor*.

Attorney General, who is accountable to, and subject to at-will removal by, the President. Specifically, the CPSC cannot prosecute or defend a civil case in federal court without written notice to the Attorney General and the Attorney General's election whether to represent the Commission in that civil action. 15 U.S.C. § 2076(b)(7)(A). Although the CPSA prescribes a role for the CPSC to play in criminal enforcement of consumer product safety laws, such criminal actions must be prosecuted through, or with the concurrence of, the Attorney General. *Id.* § 2076(b)(7)(B).

Defendants argue that the *Humphrey's Executor* exception does not apply to the CPSC because its powers, including the aforementioned enforcement powers, exceed those of the 1935 FTC and constitute "substantial executive power." Defs.' Mem. at 8–15 (citing *Seila Law*, 591 U.S. at 219, 140 S. Ct. at 2200). To be sure, at one point, the Court in *Seila Law* described the *Humphrey's Executor* exception as applicable to "multimember expert agencies that do not wield substantial executive power[.]" *Seila Law*, 591 U.S. at 218, 140 S. Ct. at 2199–200. At other points, however, *Seila Law* describes the exception as applicable to "expert agencies led by a *group* of principal officers[,]" *id.* at 204, 140 S. Ct. at 2192 (emphasis in original), and "multimember bodies with 'quasi-judicial' or 'quasi-legislative' functions," *id.* at 217, 140 S. Ct. at 2199, without mention of any degree of "executive power." In *Morrison*, the Court recognized "[t]he difficulty of defining such categories of 'executive' or 'quasi-legislative' officials[,]" and noted that, by modern standards, the 1935 FTC—the agency at issue in *Humphrey's Executor*—would be "considered 'executive,' at least to some degree." 487 U.S. at 690 n.28, 108 S. Ct. at 2619 n.28. Still, *Humphrey's Executor* remains good law and is binding. But, as the Fifth Circuit concluded in *Consumers' Research*, the Supreme Court's precedents leave unclear "*how much*" executive power an agency must wield "before [it] loses protection under the *Humphrey's* exception." 91

19

F.4th at 353. And this Court's reading of the Supreme Court's precedents suggests that the exercise of powers described as "executive" in nature, by itself, is not dispositive of whether an agency is disqualified from the *Humphrey's Executor* exception.

First, in *Morrison*, the Supreme Court stated that assessing the constitutionality of a removal restriction should not focus on "rigid" categorization of an official's powers as "purely executive," "quasi-legislative," and "quasi-judicial." *Morrison*, 487 U.S. at 689–90, 108 S. Ct. at 2618. Instead, the Court's removal analysis focuses on "ensur[ing] that Congress does not interfere with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II." *Id.*

Later, in *Seila Law*, the Court did not consider the "significant executive power" entrusted to the CFPB in isolation, but instead considered it within the context of its historically anomalous single-Director leadership structure. *See* 591 U.S. at 213–32, 140 S. Ct. at 2197–2207. The Court invalidated the CFPB Director's statutory removal restriction because the agency was both "led by a single Director *and* vested with significant executive power." *Id.* at 220, 140 S. Ct. at 2201 (emphasis added). Notwithstanding the "significant executive power" wielded by the CFPB, Chief Justice Roberts suggested in Part IV of the Court's opinion[7] that Congress could solve the constitutional problem presented in the removal restriction by "converting the CFPB into a multimember agency." *Id.* at 237, 140 S. Ct. at 2211.

---

[7] This part of the Chief Justice's opinion was not joined by a majority of the Court, but it was joined by two other Justices. And a separate group of four Justices joined an opinion dissenting from the majority's conclusion that the CFPB's removal restriction was unconstitutional. *Seila Law*, 591 U.S. at 284–96, 140 S. Ct. at 2238–44 (Kagan, J., concurring in the judgment with respect to severability and dissenting in part). The foregoing suggests that a majority of the Court at the time of *Seila Law* would have likely approved of a statutory for-cause removal restriction for a multimember commission like the CPSC.

Finally, in *Collins*, the Court clarified that "the nature and breadth of an agency's authority is not dispositive in determining whether Congress may limit the President's power to remove its head." 594 U.S. at 251–52, 141 S. Ct. at 1784. "Courts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies," and "the constitutionality of removal restrictions" does not "hinge[] on such an inquiry." *Id.* at 253, 141 S. Ct. at 1785.

In accordance with *Morrison* and *Collins*, this Court declines Defendants' invitation to engage in categorizing the CPSC's varied set of functions and powers as executive or non-executive. The degree to which the CPSC wields executive power (in the modern sense) alone does not determine whether the removal restriction in 15 U.S.C. § 2053(a) "interfere[s] with the President's exercise" of Article II powers and duties. *Morrison*, 487 U.S. at 689–90, 108 S. Ct. at 2618. The Supreme Court's reasoning in *Seila Law* demonstrates that the agency's structure also must be considered. In that case, the CFPB's organization under a single Director with statutory protection against removal, while serving a five-year term, impermissibly insulated the agency from the President's influence. *Seila Law*, 591 U.S. at 213–20, 140 S. Ct. at 2197–201. The CPSC, in contrast, is not so insulated.

The CPSC's five-member, staggered-term design would likely provide multiple opportunities each presidential term for an electorally accountable President to appoint a new Commissioner.[8] Such frequent opportunities for the elected President "to shape [the Commission's] leadership and thereby influence its activities[]" were not available under CFPB's

---

[8] Indeed, President Trump will have the opportunity to appoint Plaintiff Boyle's successor when her term expires no later than October 27 of this year and, at that point, possibly create a majority on the Commission aligned with his political preferences. ECF No. 18-2, ¶ 2; 15 U.S.C. § 2053(a)–(c). Opportunities to appoint Plaintiffs Hoehn-Saric's and Trumka's successors will follow on October 27, 2027, and October 27, 2028. ECF No. 18-2, ¶¶ 3–4.

leadership structure, given the single Director's five-year term and for-cause removal restriction. *Id.* at 225, 140 S. Ct. at 2204. Thus, the leadership structure of the CPSC, even with statutory tenure protection, permits presidential control and electoral accountability to a degree that was foreclosed by the CFPB Director's statutory tenure protection before it was invalidated in *Seila Law*. *See id.* at 220–26, 140 S. Ct. at 2201–04; *Consumers' Research*, 91 F.4th at 354 ("[CPSC] Commissioners' staggered appointment schedule means that each President *does* 'have an[] opportunity to shape [the Commission's] leadership and thereby influence its activities.'" (quoting *Seila Law*, 591 U.S. at 226, 140 S. Ct. at 2204)). Furthermore, like most independent agencies— and unlike the CFPB—the CPSC is funded through the normal appropriations process, further subjecting it to presidential influence and electoral accountability. *See id.* 591 U.S. at 226, 140 S. Ct. at 2204 (describing how CFPB's unique funding mechanism outside the appropriations process further insulates that agency from the President's influence and the control of the electorate); *Consumers' Research*, 91 F.4th at 355 ("[T]he President *can* 'influence' the [CPSC's] activities via the budgetary process." (quoting *Seila Law*, 591 U.S. at 226, 140 S. Ct. at 2204)).

Thus, unlike tenure protection for the CFPB Director, tenure protection for traditional multimember, staggered-term agencies like the CPSC and the 1935 FTC "does not interfere with" the President's Article II duties and powers, *Morrison*, 487 U.S. at 689–90, 108 S. Ct. at 2618, and it is not "incompatible with our constitutional structure[,]" *Seila Law*, 591 U.S. at 222, 140 S. Ct. at 2202.

Finally, and importantly—unlike the CFPB at issue in *Seila Law*—the structure and powers Congress prescribed for the CPSC are well-established in the history and tradition of the federal government. In *Consumers' Research*, the Fifth Circuit held that the CPSC's statutory removal restriction was supported by "historical pedigree." 91 F.4th at 354; *see also Leachco*, 103 F.4th at

762–63 (Tenth Circuit analyzing and citing *Consumers' Research* approvingly). This Court agrees. In *Seila Law*, the Supreme Court drew a clear contrast between "a traditional independent agency headed by a multimember board or commission," like the CPSC, 591 U.S. at 207, 140 S. Ct. at 2193, and the CFPB's "almost wholly unprecedented" single-Director leadership structure, describing this "lack of historical precedent" as "[p]erhaps the most telling indication of [a] severe constitutional problem . . . ." *id.* at 220, 140 S. Ct. at 2201 (quoting *Free Enterprise Fund*, 561 U.S. at 505, 130 S. Ct. at 3159). The Court also recognized that statutory removal restrictions were in place in "some two-dozen multimember independent agencies," without giving any indication of a constitutional defect among these provisions. *Seila Law*, 591 U.S. at 230, 140 S. Ct. at 2206. The historical precedent for statutory removal restrictions among traditional multimember independent agencies gives strong indication that 15 U.S.C. § 2053(a) does not violate Article II.

In sum, the CPSC closely resembles the 1935 FTC in both structure and function, and therefore qualifies for the *Humphrey's Executor* exception. The restriction against Plaintiffs' removal under 15 U.S.C. § 2053(a) does not offend the President's Article II removal power because the CPSC is a traditional "multimember bod[y] with 'quasi-judicial' or 'quasi-legislative' functions," akin to those of the FTC. *Seila Law*, 591 U.S. at 217, 140 S. Ct. at 2199 (quoting *Humphrey's Executor*, 295 U.S. at 632, 55 S. Ct. 869); *see also Morrison*, 487 U.S. at 689–90, 108 S. Ct. 2618–19 (explaining Supreme Court's use of terms "quasi-judicial" or "quasi-legislative"). Accordingly, the Court finds as a matter of law that the President's purported removal of Plaintiffs from their positions as CPSC Commissioners absent "neglect of duty or malfeasance in office" was unlawful, 15 U.S.C. § 2053(a), and Plaintiffs are entitled to appropriate relief.

## V.    REMEDIES

### A.  Declaratory Relief

The first form of relief Plaintiffs request is a declaratory judgment that "President Donald J. Trump's purported termination of Plaintiffs from their roles as Commissioners of the [CPSC] is ultra vires, contrary to law, and without legal effect." ECF No. 18-6.

The Declaratory Judgment Act authorizes a federal district court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The U.S. Court of Appeals for the Fourth Circuit "has long recognized the discretion afforded to district courts in determining whether to render declaratory relief." *Aetna Cas. & Sur. Co. v. Ind–Com Elec. Co.*, 139 F.3d 419, 421 (4th Cir. 1998) (per curiam). "A district court should issue a declaration when it will help in 'clarifying and settling' legal relationships and will 'terminate and afford relief from the uncertainty, insecurity, and controversy' driving the suit." *Reyazuddin v. Montgomery Cnty., Md.*, 754 F. App'x 186, 192–93 (4th Cir. 2018) (quoting *Aetna*, 139 F.3d at 423).

The Court finds declaratory relief to be appropriate in this case. First, there is a live controversy between the parties over whether the President has lawfully removed, or may lawfully remove, Plaintiffs from their offices as CPSC Commissioners absent "neglect of duty or malfeasance in office" under 15 U.S.C. § 2053(a). In seeking, last month, to remove Plaintiffs from their positions permanently and without cause, the President's legal interests are presently adverse to Plaintiffs'. A declaration would serve to clarify and settle the parties' legal relationships and relieve the parties from "the uncertainty, insecurity, and controversy" driving this litigation. *Reyazuddin*, 754 F. App'x at 192–93 (quoting *Aetna*, 139 F.3d at 423). Having found that

Plaintiffs' removal from their roles as CPSC Commissioners without cause is unlawful, the Court will grant Plaintiffs a declaration consistent with this ruling.

### B. Injunctive Relief

Second, Plaintiffs seek an Order from this Court enjoining Defendants Bessent, Vought, and Feldman from "taking any action to effectuate [Plaintiffs'] purported terminations[.]" Pls.' Mot. Defendants argue that the Court lacks the equitable power to order Plaintiffs' reinstatement and the only relief available to Plaintiffs is backpay. Defs.' Mem. at 17–20. It is correct that "the general availability of injunctive relief . . . depend[s] on traditional principles of equity jurisdiction[,]" *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19, 119 S. Ct. 1961, 1968, 144 L. Ed. 2d 319 (1999) (citation omitted), and "a court of equity has no jurisdiction over the appointment and removal of public officers," *In re Sawyer*, 124 U.S. 200, 212, 8 S. Ct. 482, 488, 31 L. Ed. 402 (1888). Defendants, however, misconstrue the equitable relief Plaintiffs seek. Plaintiffs do not seek to enjoin the President to reappoint them. With the President's purported termination of each Plaintiff declared effectively invalid as a matter of law, Plaintiffs seek only to enjoin the President's subordinates from obstructing their performance of their duties as CPSC Commissioners and their access to the resources necessary for such performance. This Court is persuaded that the injunctive relief Plaintiffs seek is available in this case. *See Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023) (court's "jurisdiction does not depend on deciding whether an injunction ordering a presidential appointment would be available or appropriate" where the court "can enjoin 'subordinate executive officials' to reinstate a wrongly terminated official '*de facto*,' even without a formal presidential reappointment") (citing *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996)).

After succeeding on the merits of its claim, a plaintiff seeking a permanent injunction must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *EBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 1839, 164 L. Ed. 2d 641 (2006). When the government is the defendant, the inquiry into the last two factors merge. *Kravitz v. United States Dep't of Com.*, 366 F. Supp. 3d 681, 755 (D. Md. 2019) (citing *Pursuing Am. Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016), and *Nken v. Holder*, 556 U.S. 418, 435, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009)). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court[.]" *EBay*, 547 U.S. at 391, 126 S. Ct. at 1839.

Here, Plaintiffs have suffered irreparable harm in having been deprived of participation in the affairs of the CPSC and access to the facilities and resources available and necessary to perform their statutory duties as CPSC Commissioners for the past month. Plaintiffs are unlawfully barred from participating in ongoing, consequential decisions of the CPSC that will substantially impact Commission operations and its work on behalf of the public. ECF No. 18-2, ¶ 16. Specifically, Plaintiffs are prevented from voting on Acting Chairman Feldman's proposed plan for reductions in force at the CPSC, which Plaintiffs believe will aggravate existing understaffing issues and compromise the Commission's ability to function.[9] *Id.* ¶ 17. In Plaintiffs' absence, the Acting Chairman will be able to implement his proposed plan without their input or opposition. *Id.* ¶¶ 17–

---

[9] This Court takes no position on any differences of opinion between Plaintiffs and the Acting Chairman respecting administration of the CPSC or any other matters of policy. Considering that each Plaintiff has been duly appointed to serve on the CPSC, however, the Court does find harm in the bar Defendants have unlawfully placed on their participation in the Commission's deliberations on matters of policy.

19. In the time that the CPSC has been operating without Plaintiffs' participation, the Commission has stalled the progress of certain product-safety rules that Plaintiffs believe are necessary to protect consumers, *id.* ¶¶ 23–24, 27–28; canceled budgetary and planning meetings that Plaintiffs view as important, *id.* ¶ 29; and voted to withdraw a Notice of Proposed Rulemaking for safety standards that Plaintiffs had supported, *id.* ¶ 24. The foregoing irreparable harms are certain to continue in the absence of injunctive relief, as the President has purported to discharge each Plaintiff permanently from their office as a CPSC Commissioner. Without an injunction, Plaintiffs would be prevented from serving out the remainder of their limited terms and therefore forever lose the opportunity to fulfill the statutory duties assigned to them.

Plaintiffs' injuries cannot be redressed adequately through money damages or through a remedy at law (apart from the drastic, last-resort remedy of a writ of mandamus).[10] *See Grundmann v. Trump*, --- F. Supp. 3d ---, 2025 WL 782665, at *16–17 (D.D.C. Mar. 12, 2025) ("[a] check in the mail does not address the gravamen" of losing the opportunity to "serve [one's] country at the highest possible level in [one's] field"); *Wilcox v. Trump*, No. CV 25-334 (BAH), 2025 WL 720914 (D.D.C. Mar. 6, 2025), *hearing in banc denied sub nom. Harris v. Bessent*, No. 25-5037, 2025 WL 1033740 (D.C. Cir. Apr. 7, 2025) (being "deprived of the ability to carry out [one's] congressional mandate . . . cannot be retroactively cured by monetary damages"), *appeal filed* No. 25-5057 (D.C. Cir.). "[T]he loss of the ability to do what Congress specifically directed [Plaintiffs] to do cannot be remediated with anything other than equitable relief." *Dellinger v. Bessent*, 766 F.

---

[10] As explained in Part III.C *infra*, the legal remedy of mandamus is available, *see In re Sawyer*, 124 U.S. 200, 212, 8 S. Ct. 482, 488, 31 L. Ed. 402 (1888), but the writ a "drastic" remedy to be granted only when there are "no other adequate means to attain the relief" sought, *Kerr v. U.S. Dist. Court for the N. Dist. of Cal.*, 426 U.S. 394, 402–03, 96 S. Ct. 2119, 2123–24, 48 L. Ed. 2d 725 (1976). Here, the Court finds that a writ of mandamus would be appropriate in the alternative to a permanent injunction.

Supp. 3d 57, 70–71 (D.D.C. Feb. 12, 2025), *appeal dismissed*, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025); *see also, e.g.*, *LeBlanc v. U.S. Privacy & Civil Liberties Oversight Bd.*, --- F. Supp. 3d ---, 2025 WL 1454010, at *28–32 (D.D.C. May 21, 2025) (unlawful termination of an independent agency head "implicate[s] core separation of powers issues" and is "strikingly different from . . . 'routine' employment circumstances"). And the Fourth Circuit has identified reinstatement as an appropriate equitable remedy for wrongful discharge. *See Hunter v. Town of Mocksville, N. Carolina*, 897 F.3d 538, 562 (4th Cir. 2018) (citing *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1423 (4th Cir. 1991)).

Finally, a permanent injunction reinstating Plaintiffs to their positions as CPSC Commissioners is favored by the balance of relevant hardships and does not run counter to the public interest. The CPSC plays a vital, congressionally prescribed role in "protect[ing] the public against unreasonable risks of injury associated with consumer products[,] . . . assist[ing] consumers in evaluating the comparative safety of consumer products[,]" and "develop[ing] uniform safety standards for consumer products[,]" among other purposes. 15 U.S.C. § 2051(b). Depriving this five-member Commission of three of its sitting members threatens severe impairment of its ability to fulfill its statutory mandates and advance the public's interest in safe consumer products. This hardship and threat to public safety significantly outweighs any hardship Defendants might suffer from Plaintiffs' participation on the CPSC. The Court notes again that Plaintiff Boyle's term ends in October of this year, at which point the President will have an opportunity to appoint her successor and exert significant influence over the agency. Defendants have identified no public interest in depriving this five-member Commission of three members.

The Court finds it to be in the public interest to have the persons duly appointed to occupy these key leadership positions resume their roles.[11]

Accordingly, the Court finds Plaintiffs' requested injunctive relief appropriate and shall grant it.

### C. Mandamus

Even if de facto reinstatement is unavailable as a form of equitable relief, it is available alternatively by a writ of mandamus. *See In re Sawyer*, 124 U.S. at 212, 8 S. Ct. at 488 ("The jurisdiction to determine the title to a public office belongs exclusively to the courts of law, and is exercised either by *certiorari*, error, or appeal, or by *mandamus*, prohibition, *quo warranto*, or information in the nature of a writ of *quo warranto*, according to the circumstances of the case, and the mode of procedure, established by the common law or by statute.").

A federal district court has "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. But "[m]andamus is a 'drastic' remedy that must be reserved for 'extraordinary situations' involving the performance of official acts or duties." *Cumberland Cnty. Hosp. Sys., Inc. v. Burwell*, 816 F.3d 48, 52 (4th Cir. 2016) (quoting *Kerr v. U.S. Dist. Court for the N. Dist. of Cal.*, 426 U.S. 394, 402, 96 S. Ct. 2119, 2123, 48 L. Ed.2d 725 (1976)).

---

[11] In denying Plaintiffs' request for preliminary injunctive relief, the Court found that the preliminary record did not provide a clear showing that the balance of equities favored such relief. This finding was supported by the emergency Order recently entered by the Supreme Court in *Trump v. Wilcox*, 145 S. Ct. 1415 (2025), where the Court determined that a stay of preliminary injunctive relief in that case was "appropriate to avoid the disruptive effect of the repeated removal and reinstatement of officers during the pendency of this litigation." Disruption might have resulted in the instant case if Plaintiffs had been reinstated while this case was in its preliminary posture, only to have the Court later deny relief in its final judgment and subject Plaintiffs to removal again. The risk of such disruption is no longer a factor now that the Court is granting *permanent* injunctive relief as a final judgment.

> [T]o establish the conditions necessary for issuance of a writ of
> mandamus, the party seeking the writ must demonstrate that (1) he
> has a clear and indisputable right to the relief sought; (2) the
> responding party has a clear duty to do the specific act requested;
> (3) the act requested is an official act or duty; (4) there are no other
> adequate means to attain the relief he desires; and (5) the issuance
> of the writ will effect right and justice in the circumstances.

*U.S. ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 502, 511 (4th Cir. 1999) (citing *Kerr*, 426 U.S. at 403, 96 S. Ct. at 2124).

The Court finds that the wrongful removal of a presidentially appointed Commissioner of an independent federal agency presents an "extraordinary" situation involving interference with the performance of official duties and, therefore, is suited for mandamus relief. *Cumberland Cnty. Hosp. Sys.*, 816 F.3d at 52. Each Plaintiff, having been duly appointed to serve as a CPSC Commissioner and not lawfully removed from that position, "has a clear and indisputable right to" to their office, and Defendants have a "clear" and "official" duty to provide each Plaintiff access to the resources necessary and available for each Plaintiff to perform their official duties. *Rahman*, 198 F.3d at 511. If equitable relief in the form of a permanent injunction is unavailable, then there would be "no other adequate means to attain the relief" to which each Plaintiff is entitled. *Id.* And, in these circumstances, issuance of a writ of mandamus would be right and just. *Id.*

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is granted, and Defendants' Cross-Motion for Summary Judgment is denied. Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction is denied as moot. The Court shall issue a separate declaratory judgment and permanent injunction consistent with this Memorandum Opinion.

<div style="display:flex;">

   6/13/25
_____

Date

</div>

Matthew J. Maddox
United States District Judge